United States Court of Appeals,

Fifth Circuit.

No. 92-3319.

Robert WILKERSON, Petitioner-Appellant,

v.

John P. WHITLEY, Warden, Louisiana State Penitentiary, and Richard P. Ieyoub, Attorney General, State of Louisiana, Respondents-Appellees.

Aug. 12, 1994.

Appeal from the United States District Court for the Middle District of Louisiana.

Before POLITZ, Chief Judge, and KING,[*] GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, DUHÉ, WIENER, BARKSDALE, EMILIO M. GARZA, DeMOSS, BENAVIDES, STEWART, and PARKER, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Robert Wilkerson was convicted of second-degree murder and sentenced to life imprisonment in 1975. Prior to the conviction's becoming final, the United States Supreme Court declared Louisiana's jury selection system unconstitutional but declined to apply the ruling retroactively.

Fourteen years later, after significant revision of retroactivity jurisprudence by the Court, Wilkerson unsuccessfully sought post-conviction relief, claiming, *inter alia,* that he was indicted by a grand jury that unconstitutionally excluded women. Wilkerson then brought a habeas corpus action in federal district court, which also denied relief. Concluding that we may apply retroactively neither the Supreme Court's rule declaring

---

[*]Judge King was not present at oral argument but reserved the right to participate in the determination of this case.

unconstitutional Louisiana's system of exempting women from jury venires nor modern retroactivity rules themselves, we affirm.

## I.

Wilkerson and his codefendant, Grady Brewer, currently inmates at the Louisiana State Penitentiary, were indicted in September 1973 for second-degree murder. They moved to quash the indictment on the ground that the grand jury venire contained no women, and consequently none served on the grand jury that indicted them.[1] The court denied their motion, and a jury found them guilty. On their initial appeal, the Louisiana Supreme Court affirmed Brewer's conviction and sentence but reversed as to Wilkerson and remanded for a new trial. *State v. Brewer,* 301 So.2d 630 (La.1974) (finding no error in the indictment but deciding that trial court committed reversible error in shackling Wilkerson and taping his mouth shut during trial).

Wilkerson's second trial (on the same indictment) began on January 15, 1975. The same attorney represented him in both trials. Again he was convicted, and he appealed.

The Louisiana Supreme Court affirmed and did not revisit the previously-denied motion to quash the grand jury venire. *State v. Wilkerson,* 326 So.2d 353 (La.1976). In the meantime, the United States Supreme Court had decided *Taylor v. Louisiana,* 419 U.S. 522,

---

[1]Louisiana did not exclude women from grand juries but merely provided them with an exemption. At the time of Wilkerson's trial, the state constitution provided that "no woman shall be drawn for jury service unless she shall have previously filed with the clerk of the District Court a written declaration of her desire to be subject to such service." LA. CONST. art. VII, § 41 (repealed eff. Jan. 1, 1975).

2

95 S.Ct. 692, 42 L.Ed.2d 690 (1975), holding that the state constitutional provision, insofar as it permitted women to be exempted from *petit* jury venires, violated the Sixth and Fourteenth Amendments, and *Daniel v. Louisiana,* 420 U.S. 31, 32, 95 S.Ct. 704, 705, 42 L.Ed.2d 790 (1975), holding that *Taylor* would not be applied retroactively to "convictions obtained by juries empaneled prior to the date of [*Taylor* ]."  In February 1989, Wilkerson filed an application for post-conviction relief in the state trial court, raising five issues, one of which was that he was denied his Sixth and Fourteenth Amendment rights because of the exemption of women from jury service.  The trial court denied post-conviction relief in March 1989, and the Louisiana Supreme Court denied writs two months later.  *Wilkerson v. Smith,* 580 So.2d 370 (La.1991). Wilkerson then sought habeas relief in federal district court, which adopted the magistrate judge's recommendation that relief be denied.

A panel of this court, bound by circuit precedent in *Leichman v. Secretary, La. Dep't of Corrections,* 939 F.2d 315 (5th Cir.1991) (per curiam), reversed and remanded with instructions to grant habeas relief.  *Wilkerson v. Whitley,* 16 F.3d 64 (5th Cir.1994). That opinion was vacated by the en banc vote on the panel's recommendation that *Leichman* be reconsidered.  *Id.* at 68.

II.

A.

Wilkerson argues that he should receive the benefit of *Taylor* because the decision was announced before his conviction became

3

final.  The panel assumed that a decision declaring unconstitutional Louisiana's *petit* jury selection system would also apply to *grand* juries.  *Id.* at 65 ("Wilkerson was indicted by a grand jury that unconstitutionally excluded women....").  We do not find it necessary to decide whether this assumption is valid, as we resolve this case by applying *Daniel,* as we explain *infra.* Nonetheless, we explore the assumption to show that there is a colorable argument that a holding regarding the exclusion of women from *grand* juries would constitute a new rule.

If our decision here would be the first time a court had declared Louisiana's former *grand* jury system unconstitutional, arguably we would be declaring a new rule.  If so, Wilkerson could not take advantage of it, as his direct appeal long ago became final.[2]  Thus, the question is whether a conclusion regarding *grand* juries departs significantly from the conclusion regarding *petit* juries so as to be considered a new rule.

1.

---

[2]*Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987).  New rules will not be applied or announced in cases on collateral review unless they fall into one of two narrow exceptions:  A new rule should be applied retroactively only if (1) it places certain kinds of individual conduct beyond the power of the criminal lawmaking authority to proscribe or (2) it requires the observance of those procedures that are implicit in the concept of ordered liberty.  *Teague v. Lane,* 489 U.S. 288, 307, 109 S.Ct. 1060, 1073, 103 L.Ed.2d 334 (1989).  Neither exception applies to this case.  The second exception applies to procedures without which the accuracy of the conviction is seriously diminished.  *Teague* held that a rule requiring that petit juries be composed of a fair cross-section of the community would not be such a bedrock procedural element requiring retroactive application.  *Id.* at 315, 109 S.Ct. at 1078.

The *Taylor* Court limited its holding to petit jury selection and did not announce a rule about the exclusion of women from grand juries.[3] The Supreme Court case addressing the exclusion of women from grand juries, *Edwards v. Healy,* 421 U.S. 772, 95 S.Ct. 2410, 44 L.Ed.2d 571 (1975), merely remanded to the district court to determine whether the matter had become moot because Louisiana had changed its jury selection rule. Although the Court has addressed *racial* discrimination in grand jury selection, *see Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), it has never explicitly declared unconstitutional the exemption of women from grand jury pools.

In *Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972), the Court raised the issue but set aside the conviction on other grounds. The Court passed on another opportunity to address the issue of under-representation of women on grand juries in *Ford v. Kentucky,* 469 U.S. 984, 105 S.Ct. 392,

---

[3]419 U.S. at 538, 95 S.Ct. at 702 ("in holding that *petit* juries must be drawn from a source fairly representative of the community ...") (emphasis added); *id.* at 527, 95 S.Ct. at 696 ("[T]he American concept of the jury *trial* contemplates a jury drawn from a fair cross section of the community.") (emphasis added); *id.* at 533, 95 S.Ct. at 699 ("[W]omen cannot be systematically excluded from jury panels from which *petit* juries are drawn.") (emphasis added). Not only does *Taylor* limit its holding to petit juries, but the rationales for that holding apply uniquely to the petit jury. In at least eighteen separate instances in *Taylor,* the Court emphasized either the guilt-determination role of the petit jury, the petit jury's role as a check on prosecutorial mistake, or the defendant's Sixth Amendment right to a trial jury venire composed of a fair cross-section of the community.

83 L.Ed.2d 325 (1984) (denying certiorari).[4]

2.

"[A] case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government." *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070. *Taylor* declared unconstitutional Louisiana's petit jury selection system. The relevant inquiry is whether that rule controls the issue of grand juries selected under the same system. If the conclusion is "susceptible to debate among reasonable minds," the latter decision is a new rule, even if "controlled" or "governed" by the earlier decision. *Butler v. McKellar,* 494 U.S. 407, 415, 110 S.Ct. 1212, 1217, 108 L.Ed.2d 347 (1990); *see also Stringer v. Black,* --- U.S. ----, ---- - ----, 112 S.Ct. 1130, 1140-41, 117 L.Ed.2d 367 (1992) (Souter, J., dissenting). The test is whether the result is "dictated" by existing precedent. *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070.

3.

The right to trial by jury finds its constitutional bases in article III, § 2, cl. 3, of the Constitution ("The Trial of all Crimes ... shall be by Jury....") and the Sixth Amendment ("In all criminal prosecutions, the accused shall enjoy the right to a ... trial[ ] by an impartial jury...."). The Founding Fathers

---

[4]*J.E.B. v. Alabama ex rel. T.B.,* --- U.S. ----, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), dealing with sex discrimination in peremptory challenges, is inapposite to the inquiry, as we must determine whether the result is dictated by *Taylor,* not by another line of authority subsequent to *Taylor* (and therefore subsequent to the finality of Wilkerson's appeal).

obviously considered the right to a jury trial of paramount importance; Hamilton called this right "the very palladium of free government." THE FEDERALIST No. 83, at 499 (Alexander Hamilton) (Clinton Rossiter ed., 1961); *see also* Letter from Richard Henry Lee to Edmund Randolph (Oct. 16, 1787) (describing trial by jury as "this great security of human rights"). Colonial revolutionaries listed in the Declaration of Independence the deprivation of the right as a grievance against England. And, as Joseph Story noted in the *Commentaries on the Constitution,*

> [Trial by jury] was from very early times insisted on by our ancestors in the parent country, as the great bulwark of their civil and political liberties, and watched with an unceasing jealousy and solicitude....
>
> ... "A celebrated French writer, who concludes, that because Rome, Sparta, and Carthage have lost their liberties, therefore those of England in time must perish, should have recollected, that Rome, Sparta, and Carthage, at the time, when their liberties were lost, were strangers to the trial by jury."

3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION, §§ 1773-1774 (1833) (quoting Justice Blackstone).

The right to indictment by a grand jury finds its constitutional basis in the Fifth Amendment ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on ... indictment of a Grand Jury...."). In contrast to the right to trial by jury, the right to grand jury indictment received little attention at the Constitutional Convention. The provision does not prevent states from instituting prosecutions without an

indictment,[5] and the Supreme Court has concluded that neither the *Grand Jury Clause of the Fifth Amendment nor* the Due Process Clause of the Fourteenth Amendment requires the state to afford the accused the right to grand jury review before trial. *Hurtado v. California,* 110 U.S. 516, 534-35, 4 S.Ct. 111, 120-21, 28 L.Ed. 232 (1884).

By the end of the nineteenth century, many states had abandoned the grand jury system and amended their constitutions to allow the initiation of prosecution by information. Currently, only twenty-three states require indictment by grand jury, four of which require an indictment only in cases punishable by life imprisonment or death. 1 SARA S. BEALE & WILLIAM C. BRYSON, GRAND JURY LAW & PRACTICE § 2.04 (1986).

The grand jury determines (by majority vote[6]) whether probable cause exists to issue an indictment. The grand jury meets in secret and, except in certain circumstances, must not reveal testimony before it. FED.R.CRIM.P. 6(e). It is not bound by evidentiary restrictions. *See* FED.R.EVID. 1101(d)(2); *United States v. Calandra,* 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38

---

[5]*See* 2 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION AS RECOMMENDED BY THE GENERAL CONVENTION AT PHILADELPHIA IN 1787, at 109 (Jonathan Elliot, ed., 1888) (remarks of Mr. Holmes at Massachusetts Ratifying Convention, Jan. 30, 1788).

[6]Most states that require a grand jury indictment require only a majority or supermajority vote; three states may require a unanimous vote, depending upon the number of jurors. 1 BEALE & BRYSON, *supra,* § 2.04. A federal grand jury must have an affirmative vote of at least 12 of the 16 to 23 jurors to indict. FED.R.CRIM.P. 6(a)(1), (f).

L.Ed.2d 561 (1974); *Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 408-09, 100 L.Ed. 397 (1956) (holding indictment valid even if based exclusively upon hearsay). It is not bound by constitutional exclusionary rules. *Calandra,* 414 U.S. at 349, 94 S.Ct. at 620-21. And there is no right to counsel when appearing before the grand jury. FED.R.CRIM.P. 6(d). Moreover, prosecutorial misconduct in a grand jury proceeding may be deemed harmless if the petit jury convicts. *United States v. Mechanik,* 475 U.S. 66, 72, 106 S.Ct. 938, 942-43, 89 L.Ed.2d 50 (1986).

Despite these differences, the Supreme Court has said that "[t]he principles that apply to the systematic exclusion of potential jurors on the ground of race are essentially the same for grand juries and for petit juries." *Alexander,* 405 U.S. at 626 n. 3, 92 S.Ct. at 1223 n. 3. The *Alexander* Court did not, however, address Louisiana's exemption of women from jury service, leaving that issue for *Taylor.* Thus, even if we could conclude that the *exclusion* of protected groups from jury duty would be unconstitutional for both petit and grand juries, this result would not necessarily be dictated for a system that merely *exempts* a group from service.[7]

4.

Although an exemption for women seems archaic and even offensive by today's standards, we present the foregoing discussion

---

[7]Take, for example, then-Justice Rehnquist's dissent in *Taylor.* He would have required a showing of prejudice to the defendant by the exemption of women from service. 419 U.S. at 522, 95 S.Ct. at 692 (Rehnquist, J., dissenting).

9

to show that there is a colorable argument that, at the time *Taylor* was decided, *Taylor* did not dictate the result Wilkerson seeks to employ. If the result was not dictated, Wilkerson could not, under *Teague,* benefit even if it were squarely announced today that the former Louisiana grand jury provision was unconstitutional. And, as the following discussion concludes, even if the result was dictated, *Daniel* bars its application in this case. Accordingly, we pretermit the new-rule issue and decide this case on the basis of the applicability of *Daniel.*

### B.

Even if *Taylor* dictates the result here—and Louisiana's grand jury selection system was unconstitutional—we still must resolve whether Wilkerson can take advantage of that result under *Griffith* and *Teague.* We conclude that he may not.

In *Leichman,* a panel of this court held that a habeas petitioner could take advantage of the rule announced in *Taylor* before his conviction was final because "[t]he law regarding retroactivity changed drastically when the court decided *Griffith* ... and *Teague.*" 939 F.2d at 317. That panel did not consider the implications under *Teague* of applying *Griffith* retroactively; it merely appeared to assume that it could do so.

Although bound by *Leichman* to grant habeas relief, another panel in *Williams v. Whitley,* 994 F.2d 226 (5th Cir.), *cert. denied,* --- U.S. ----, 114 S.Ct. 608, 126 L.Ed.2d 572 (1993), suggested that *Daniel* still should control the application of *Taylor.* As the *Williams* panel recommended, *see id.* at 236, we

10

elected to rehear *Williams* en banc *sub nom. Fulford v. Whitley, see Williams, id.,* to decide this issue, but the case was mooted by the petitioner's violent death while in prison.

In *Williams,* Judge Higginbotham, writing for the panel, discussed the retroactivity issue at length. *See id.* at 234-36. The petitioners in *Williams* presented the same claims Wilkerson now asserts. "Recognizing that they would have been entitled to new trials had *Griffith* governed questions of retroactivity at the time *Taylor* was decided, [the petitioners] asserted they should *now* be given the benefit of that decision because *Griffith* had "overruled' *Daniel.*" *Id.* at 230. The panel observed that the petitioners sought to apply selectively the law prevailing at the time their convictions became final, as they wanted to invoke *Taylor* but avoid *Daniel. Id.* at 235.

Wilkerson follows Williams and Fulford in arguing that *Griffith* overruled *Daniel.* As Judge Higginbotham stated, however, "absent clear indications from the Supreme Court itself, lower courts should not lightly assume that a prior decision has been overruled *sub silentio* merely because its reasoning and result appear inconsistent with later cases."[8] Thus, the court concluded that *Griffith* did not overrule *Daniel.* Moreover, even if *Griffith* established a new rule of constitutional law, it should not apply

---

[8]*Id.* (citing *Rodriquez de Quijas v. Shearson/Am. Express, Inc.,* 490 U.S. 477, 484-85, 109 S.Ct. 1917, 1921-22, 104 L.Ed.2d 526 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.")).

retroactively to cases on collateral attack.

In his en banc brief, Wilkerson makes four arguments regarding the grand jury. He contends, first, that the state waived the retroactivity defense; second, that *Griffith* overruled *Daniel;* third, that *Griffith* should apply retroactively; and fourth, that his claim is independent of *Taylor.*

1.

Wilkerson claims that the state waived the retroactivity defense. Because *Griffith* 's nonretroactivity doctrine is nonjurisdictional, *Collins v. Youngblood,* 497 U.S. 37, 40-41, 110 S.Ct. 2715, 2718, 111 L.Ed.2d 30 (1990), a state can waive the defense by not raising it. *Godinez v. Moran,* --- U.S. ----, ---- n. 8, 113 S.Ct. 2680, 2685 n. 8, 125 L.Ed.2d 321 (1993); *see also Schiro v. Farley,* --- U.S. ----, ---- - ----, 114 S.Ct. 783, 788-89, 127 L.Ed.2d 47 (1994). Nevertheless, in *Schiro* the Court acknowledged that it would have discretion to reach the retroactivity issue, as the state may rely upon any legal argument in support of the judgment. *Id.* at ----, 114 S.Ct. at 788 (citing *Dandridge v. Williams,* 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 1156-57 n. 6, 25 L.Ed.2d 491 (1970)).

It is true that the state failed to raise this issue in its original brief and failed to attend oral argument before the panel. Nonetheless, we elect to reach the retroactivity issue, first because we have discretion to do so, and second because it was the primary reason given by the district court for its judgment. This case has been about retroactivity from its inception; this

12

question demands resolution.

2.

The crux of Wilkersons' argument is that *Leichman* was correctly decided, because *Griffith* overruled *Daniel.* As stated in *Williams,* however, this argument is flawed.

Prior to 1965, constitutional decisions creating new rules of criminal procedure were applied retroactively.  Paul E. McGreal, Note, *Back to the Future:  The Supreme Court's Retroactivity Jurisprudence,* 15 HARV.J.L. & PUB. POL'Y 595, 595 (1992).  At common law, the judges could make neither prospective nor nonretroactive rulings.[9]  The common law followed the Blackstonian view that a judge's duty was not to "pronounce a new law, but to maintain and expound the old one."  1 WILLIAM BLACKSTONE, COMMENTARIES *69.  The judge, rather than creating law, discovered it.  An overruled decision was thought to be only a failure at true discovery;  the overruling decision was not new law, but an application of what is, and theretofore had been, the true law.  New decisions applied retroactively to avoid the injustice caused by the earlier application of "incorrect" law.

In *Linkletter v. Walker,* 381 U.S. 618, 636-37, 85 S.Ct. 1731, 1741-42, 14 L.Ed.2d 601 (1965), however, the Court adopted a three-part test for claims of retroactivity of new constitutional rules of criminal procedure.  Retroactive application of a new rule

---

[9]*See Kuhn v. Fairmont Coal Co.,* 215 U.S. 349, 372, 30 S.Ct. 140, 148, 54 L.Ed. 228 (1910) (Holmes, J., dissenting) ("I know of no authority in this court to say that in general state decisions shall make law only for the future.  Judicial decisions have had retrospective operation for near a thousand years.").

13

depended upon the purpose to be served by the new standard, the extent of reliance by law enforcement authorities upon the old standard, and the effect of retroactive application upon the administration of justice. *Stovall v. Denno,* 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967).

The Court determined that the *Linkletter* analysis applied both to convictions that were final and to those pending on direct review. *Johnson v. New Jersey,* 384 U.S. 719, 732, 86 S.Ct. 1772, 1780, 16 L.Ed.2d 882 (1966). Courts declaring a rule of criminal procedure to be "a clear break with the past," *Desist v. United States,* 394 U.S. 244, 248, 89 S.Ct. 1030, 1032, 22 L.Ed.2d 248 (1969), almost always found the new rule nonretroactive because the second and third *Stovall* factors—reliance by law enforcement authorities upon the old rule and the effect upon the administration of justice—compelled a finding of nonretroactivity. *United States v. Johnson,* 457 U.S. 537, 549-50, 102 S.Ct. 2579, 2586-87, 73 L.Ed.2d 202 (1982). As a result, a number of Supreme Court decisions held new rules nonretroactive even for cases pending on direct review. One of these cases was *Daniel.*

*Griffith* overruled *Linkletter* 's retroactivity test (as clarified by *Johnson v. New Jersey, Stovall,* and *Desist* ) by creating a bright-line rule that applies new rules to all cases not yet final. This line of cases had established the test for how to apply new constitutional decisions. On the other hand, cases such as *Daniel* merely applied the test to particular new constitutional rules. Thus, while *Griffith* changed the *methodology* for

14

determining retroactivity, it did not abrogate the *results* of the prior retroactivity test. In the absence of explicit language overruling cases such as *Daniel,* we must assume that these results are still valid as to those new rules for which retroactive application was rejected.[10]

Wilkerson argues that *Griffith* "accuses *Daniel* by name." But *Griffith* mentions *Daniel* only as a case applying the *Linkletter /Stovall* retroactivity analysis. Wilkerson argues that the *Williams* panel was mistaken in concluding that the Supreme Court has "given no indication *Daniel* is no longer good law." Significantly, however, *Teague* cites *Daniel,* apparently with approval: "[b]ut as we stated in *Daniel,* which held that *Taylor* was not to be given retroactive effect...." *Teague,* 489 U.S. at 314, 109 S.Ct. at 1077.

Of course, *Daniel* does not reflect the *current* state of the law. In the absence of *Linkletter* and *Stovall,* the *Daniel* court presumably would have reached a contrary result. But the question is whether, for cases on collateral review, to apply the *Daniel* rule or the *Griffith* rule to cases not yet final when *Taylor* was announced.

*Teague* instructs us to " "apply the law prevailing at the time a conviction became final.' " 489 U.S. at 306, 109 S.Ct. at 1073 (quoting with approval *Mackey v. United States,* 401 U.S. 667, 689, 91 S.Ct. 1160, 1178, 28 L.Ed.2d 404 (1971) (Harlan, J., concurring in part, dissenting in part)). The law in 1975 was *Daniel,* which

---

[10]*See supra* note 8.

forthrightly held that *Taylor* was not to be applied retroactively and that criminal defendants whose juries were empaneled prior to *Taylor* could not take advantage of the new rule. *Griffith* does not change this result.[11]

3.

In a conceptually similar line of reasoning, Wilkerson argues that *Griffith* should itself apply retroactively. He relies upon *Penry v. Lynaugh,* 492 U.S. 302, 315, 109 S.Ct. 2934, 2944, 106

---

[11]Wilkerson's argument, if accepted, would prove too much. Logically, if *Griffith* controls instead of *Daniel,* it also controls instead of the following cases: *Johnson v. New Jersey,* 384 U.S. 719, 721, 86 S.Ct. 1772, 1774-75, 16 L.Ed.2d 882 (1966) (holding nonretroactive *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), which established right to counsel at police interrogation in some circumstances, and *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), which held certain warnings and waivers required before police interrogation); *Stovall v. Denno,* 388 U.S. 293, 300, 87 S.Ct. 1967, 1971, 18 L.Ed.2d 1199 (1967) (holding nonretroactive *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), which required the conclusion of witness identification that occurred in the absence of counsel); *DeStefano v. Woods,* 392 U.S. 631, 635, 88 S.Ct. 2093, 2096, 20 L.Ed.2d 1308 (1968) (holding nonretroactive *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), which established right to jury trial in state criminal prosecutions, and *Bloom v. Illinois,* 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968), which established right to jury trial in state contempt prosecutions) *Desist v. United States,* 394 U.S. 244, 254, 89 S.Ct. 1030, 1036, 22 L.Ed.2d 248 (1969) (holding nonretroactive *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), which held physical intrusion not required for Fourth Amendment violation); and *United States v. Peltier,* 422 U.S. 531, 542, 95 S.Ct. 2313, 2320, 45 L.Ed.2d 374 (1975) (holding nonretroactive *Almeida-Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), which invalidated warrantless automobile searches conducted without probable cause by roving border patrols). No one could seriously contend that *Griffith* opened the door to scores of habeas petitioners to challenge their convictions obtained prior to, but which became final after, these landmark decisions.

L.Ed.2d 256 (1989), where the Court applied *Griffith* 's retroactivity rule to allow a habeas petitioner to take advantage of two Supreme Court cases decided before his appeal was final but before the decision in *Griffith.* Thus, *Griffith* 's retroactivity principles were applied by the Court even though the law of retroactivity at the time the petitioner's conviction became final was still *Linkletter/Stovall.*

Although the *Penry* Court did not explain its reasoning, Wilkerson argues that the retroactive application of a retroactivity rule does not raise the problems voiced in *Teague* concerning the state's interest in finality. He contends that a retroactivity rule imposes no new obligations on law enforcement or on the judicial system. Moreover, Wilkerson points out that in the only five cases where the issue of the retroactivity of *Griffith* has come up, the courts applied *Griffith* retroactively.[12] Thus,

---

[12]*Wiley v. Puckett,* 969 F.2d 86, 101 (5th Cir.1992) (applying without discussion *Griffith* retroactivity principles to claim, ultimately barred on another ground, under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), where appeal became final after *Batson* but before *Griffith*); *Pitts v. Cook,* 923 F.2d 1568, 1571 n. 3 (11th Cir.1991) (same, but not barring *Batson* claim on another ground); *Liles v. Saffle,* 945 F.2d 333, 335 n. 2 (10th Cir.1991) (same situation with claim under *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985)), *cert. denied,* --- U.S. ----, 112 S.Ct. 956, 117 L.Ed.2d 123 (1992); *Hill v. Maloney,* 927 F.2d 646, 648 n. 2 (1st Cir.1990) (same situation with claim under *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979)). Contrary to the statement in Judge Parker's special concurrence that these courts "conclude that the *Griffith* approach to "new rule' retroactivity is to be itself retroactively applied to cases not yet final," special concurrence, *infra* at 5708, these courts appear to have assumed this, without explanation. Their silence is best viewed as a failure to address or decide the issue, and in the absence of such analysis they are unpersuasive.

17

both the Supreme Court and other circuits have applied *Griffith* 's retroactivity rule to cases that became final before *Griffith* (but after some relevant Supreme Court decision).

We reject this argument for four reasons. First, *Penry* dealt with a capital murder habeas petitioner whom in 1980 the trial court had denied the right to have the sentencing jury instructed to consider his retardation as a mitigating circumstance. The Court applied the rule established in *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978), that the Eighth and Fourteenth Amendments required that a sentencer "not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character ... that the defendant proffers as a basis for a sentence less than death," and *Eddings v. Oklahoma,* 455 U.S. 104, 113-14, 102 S.Ct. 869, 876-77, 71 L.Ed.2d 1 (1982), which required that a sentencer *must* consider such mitigating evidence. In applying these cases, the Court noted that *Lockett* was decided not just before Penry's appeal became final, but before his trial even began. Thus, *Lockett* was the law at the time of Penry's sentencing; retroactivity was not actually at issue.

Second, the Court concluded that the relief Penry sought was not a "new rule," because it did not impose a new obligation on the state, as the obligation to present special issues to the jury already existed in *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). Implicit in the requirement that the jury answer three special questions is the requirement that the jury consider mitigating evidence. "Penry simply asks the State to

18

fulfill the assurance upon which *Jurek* was based:  namely, that the special issues would be interpreted broadly enough to permit the sentencer to consider all of the relevant mitigating evidence a defendant might present in imposing sentence." *Penry,* 492 U.S. at 315, 109 S.Ct. at 2945.  Thus, the state had been obligated since 1976 to give the relief Penry sought.  No retroactivity problems therefore attached.

Third, Wilkerson claims that the retroactive application of a retroactivity rule does not impair a state's interest in finality. But a retroactivity rule is exactly the type of decision that would seriously disrupt a state's interest in finality:  If the laws of retroactivity change, any future decision conceivably could be employed by a habeas petitioner, regardless of how long ago his appeal became final.  Depending upon the change in the retroactivity rule, convictions could be subject to collateral attack indefinitely.

As Judge Higginbotham notes, "the Court has made plain that the rule established in *Teague* is asymmetric, cutting only one way—in the state's favor."  Patrick E. Higginbotham, *The Future of Habeas Corpus:  Reflections on* Teague v. Lane *and Beyond,* 66 CAL.L.REV. 2433, 2440 (1993) (citing *Lockhart v. Fretwell,* --- U.S. ----, ----, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993)).  A state can take advantage of changes in the law occurring after a conviction becomes final, as well as before, while, under *Teague,* the defendant generally may rely only upon legal developments occurring before his conviction is final.

19

Thus, *Teague* acts as a substantial limitation on the availability of habeas relief by protecting the state's interest in finality. The retroactive application of *Griffith* unavoidably would upset that interest. *See supra* note 11. As this court explained in *Williams,* 994 F.2d at 236, that is why we give retroactive treatment to *Teague* but not to *Griffith. See Fretwell,* --- U.S. at ----, 113 S.Ct. at 844; *Gilmore v. Taylor,* --- U.S. ----, ----, 113 S.Ct. 2112, 2116, 124 L.Ed.2d 306 (1993).

And fourth, even if, *arguendo,* we were to conclude that in *Penry,* 492 U.S. at 315, 109 S.Ct. at 2945, the Court applied *Griffith* 's retroactivity principles retroactively in a case that became final before *Griffith,*[13] the Court did not even colorably overrule *sub silentio* any prior decisions, as no prior decision had declared *Lockett* or *Eddings* nonretroactive. But here, we have *Daniel.* Where (1) a specific case decides (2) a specific outcome concerning (3) a specific new rule (e.g., *Daniel* 's declaring nonretroactive *Taylor* 's holding), an inferior court may not disregard that precedent unless it has been explicitly overruled by the Supreme Court. *See Rodriguez de Quijas,* 490 U.S. at 484-85, 109 S.Ct. at 1921-22.

We are not called upon here merely to determine which

---

[13]Although the *Penry* Court purported to apply *Griffith* retroactively, *see* 492 U.S. at 315, 109 S.Ct. at 2945 ("Under the retroactivity principles adopted in *Griffith* ..., Penry is entitled to the benefit of those decisions."), it did not appear actually to do so. It granted relief based upon *Lockett* and *Jurek,* both of which were decided *before* Penry's trial began. Thus, in merely requiring the state to apply the law as it existed at the time, the Court implicated neither *Griffith* nor *Linkletter.*

retroactivity principles to apply to a new rule. Instead, we are bound by *stare decisis.* The specific question of whether a particular new rule (*Taylor* ) should be applied retroactively has already been resolved by *Daniel.* Thus, retroactive application of *Griffith* is blocked by *Daniel.*

In other words, where a determination of retroactivity has been made for a particular new rule, *stare decisis* prohibits revisiting the question with new retroactivity principles. In every case cited by Wilkerson, the court applied *Griffith* retroactively where no specific case precluded the result by deciding the retroactivity of the new rule. Here, *Daniel* blocks that result. This distinction defeats Wilkerson's argument.[14]

---

[14]Furthermore, the retroactive application of *Griffith* would violate *Teague* because it would be applying a new rule on collateral review. We decline to follow the other circuits that implicitly, and perhaps inadvertently, have applied *Griffith* retroactively. *See supra* note 12.

In his well-intentioned concurrence, Judge Parker does not appear to recognize that it is in fact *Griffith* that constitutes the "new rule" that we may not apply on collateral review, under *Teague,* because *Griffith* was announced in 1987, well after Wilkerson's conviction became final in 1976. Thus, when Judge Parker quotes *Teague* for the proposition that " "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced,' " special concurrence, *infra* at 5710 (quoting *Teague,* 489 U.S. at 310, 109 S.Ct. at 1075), it is actually *Griffith* that is the new rule that we are forbidden to apply.

Judge Parker would have us fashion, out of whole cloth, a third *Teague* exception for habeas petitioners whose convictions became final after some directly relevant Supreme Court decision was announced, but before *Griffith,* unless a retroactivity "companion case" (such as *Daniel* ) blocked the result. We find no support for this third exception in *Teague* or elsewhere.

4.

Finally, Wilkerson argues opaquely that the right to a fair cross-section of the community in state grand juries was firmly rooted before *Taylor.* This argument seeks to avoid the *Daniel* bar because the relief Wilkerson wants would be dictated by *earlier* authorities, not by *Taylor.* And the argument avoids the *Teague* bar because he claims the relief is *dictated* by these earlier cases (so that no new rule would be announced today by declaring the grand jury system unconstitutional).

The problem with this analysis is that earlier cases do not necessarily dictate that Louisiana's grand jury exemption of women was unconstitutional, *see supra* part II.A., and, to the extent that *Taylor* dictates the result, *Daniel* would bar the application of the rule, and *Teague* would prohibit us from ignoring *Daniel.* Wilkerson cites *Smith v. Texas,* 311 U.S. 128, 132, 61 S.Ct. 164, 166, 85 L.Ed. 84 (1940), prohibiting racial discrimination in the selection of state grand juries; *Carter v. Jury Comm'n of Greene County,* 396 U.S. 320, 338-39, 90 S.Ct. 518, 528, 24 L.Ed.2d 549 (1970), which rejected a claim of racial discrimination in the selection of the Alabama jury commission; and *Peters v. Kiff,* 407 U.S. 493, 501, 92 S.Ct. 2163, 2168, 33 L.Ed.2d 83 (1972), which allowed a white defendant to challenge a state grand jury system that excluded blacks. Of course, none of these cases deals with the exemption of women from jury service. Given the standard required to prove that a result is dictated by a particular precedent, it is meritless to claim that these cases *dictate* that Louisiana's system of exempting

22

women from grand jury service was unconstitutional.

The closest the Supreme Court has come to declaring unconstitutional Louisiana's grand jury selection system is *Taylor,* which held the state's *petit* jury selection system unconstitutional. Although the same system was used to select both petit and grand juries, the constitutional rights that attach to each vary. Accordingly, these earlier grand jury cases do not come close to dictating the result Wilkerson seeks, so the result is barred by *Daniel* and *Teague.*[15]

### III.

In summary, the pivotal issue in this case is whether *Daniel* was overruled. Since the Supreme Court has never explicitly overruled *Daniel,* it is still valid, but only, as here, where habeas petitioners seek to take advantage of the rule announced in *Taylor* but whose convictions became final before *Griffith.* Even if *Daniel* was overruled, the retroactive application of *Griffith* is barred by *Teague.*

*Daniel* is a specific case that reaches a specific result regarding a particular new rule. We are not free merely to apply the modern set of retroactivity principles instead of the old ones. We would have to ignore not only the square holding of *Daniel,* but the *Teague* ban on retroactive application of new rules on

---

[15]Moreover, even if we applied these earlier cases to provide the relief Wilkerson seeks, we would still be bound by *Teague* to apply the retroactivity rules at the time the conviction became final. Under *Linkletter,* the then-binding authority on retroactivity, the result would not have been applied retroactively.

collateral review. Finding that result impermissible, we overrule *Leichman v. Secretary, La. Dep't of Corrections,* 939 F.2d 315 (5th Cir.1991) (per curiam), and affirm the district court's denial of habeas relief.

## IV.

Wilkerson raises several other assignments of error. These issues were adequately addressed by the panel opinion. In all respects other than as to matters discussed herein, the panel opinion is reinstated. The judgment of the district court is AFFIRMED.

KING, Circuit Judge, concurs in the judgment.

E. GRADY JOLLY, Circuit Judge, specially concurring:

I concur in the judgment on the sole grounds that the doctrine of *stare decisis* commands that *Daniel v. Louisiana,* 420 U.S. 31, 95 S.Ct. 704, 42 L.Ed.2d 790 (1975), remains binding precedent. Consequently, Mr. Wilkerson is not entitled to the benefit of *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), and we correctly deny his petition for habeas relief.

ROBERT M. PARKER, Circuit Judge, specially concurring:

Judge Smith's thorough and commendable attempt to navigate through retroactivity jurisprudence with a less than consistent Supreme Court roadmap leaves me in agreement with the result obtained and with some of the reasons for the result. Yet I am sufficiently troubled by other reasoning in the opinion that I have found myself constrained to the options of concurring in the result only or writing a special concurrence. I choose the latter.

24

I agree with the majority's assumption that the "*Taylor* rule" applies to the grand jury context. In my view, the Fourteenth Amendment's equal protection clause undoubtedly requires a fair cross-section of the community with respect to grand juries. There may be no requirement for states to utilize grand juries, but when they do, this fair cross-section requirement exists. Because I see no legitimate basis for distinguishing between petit and grand juries in this regard, I agree with the majority's course in this particular case—of assuming that *Taylor* applies to grand juries.

I cannot, however, join the majority's position about the nonretroactivity of *Griffith.* In addition to reversing the law in the Fifth Circuit, the majority's conclusion that *Teague v. Lane* bars the retroactive application of the approach to "new rule" retroactivity embraced in *Griffith* places this Circuit at odds with all of the other circuits that have addressed the issue and with the Supreme Court. The First Circuit in *Hill v. Maloney,* 927 F.2d 646 (1st Cir.1990), the Eighth in *Hamilton v. Jones,* 907 F.2d 807 (8th Cir.1990), the Tenth in *Liles v. Saffle,* 945 F.2d 333 (10th Cir.1991), *cert. denied,* --- U.S. ----, 112 S.Ct. 956, 117 L.Ed.2d 123 (1992), and the Eleventh in *Pitts v. Cook,* 923 F.2d 1568 (11th Cir.1991), all conclude that the *Griffith* approach to "new rule" retroactivity is to be itself retroactively applied to cases not yet final when the "new rule" in question was announced. And, as the Supreme Court states in *Penry:*

> Penry's conviction became final on January 13, 1986, when this Court denied his petition for certiorari on direct review of his conviction and sentence. This Court's decisions in *Lockett v. Ohio* and *Eddings v. Oklahoma* were rendered before

25

his conviction became final. Under the retroactivity principles adopted in *Griffith v. Kentucky,* Penry is entitled to the benefit of those decisions.

*Penry,* 492 U.S. 302, 314-315, 109 S.Ct. 2934, 2944-45, 106 L.Ed.2d 256 (1989) (citations omitted).

The majority takes the position that the Supreme Court does not mean what it says in *Penry*—because, given that the case rules to which Mr. Penry claimed entitlement were announced *before his trial even started,* their retroactivity was not really in issue and thus *Griffith* was not squarely implicated. Majority Opinion at 5706 n. 13 ("Although the *Penry* Court purported to apply *Griffith* retroactively, ... it did not appear actually to do so. It granted relief based upon *Lockett* and *Jurek,* both of which were decided before Penry's trial began."). The majority's characterization of *Penry* in this respect is incomplete. It is accurate as far as *Lockett* and *Jurek* are concerned. However, the *Penry* Court gives at least equal billing to *Eddings*—which came down in 1982, after the start of Mr. Penry's trial but nonetheless before his conviction and sentence became final.

We could of course debate whether the *Eddings* decision announces a "new rule" or whether it merely reaffirms and refines the rule of *Lockett.* Essentially, such a debate would be a replay of the one that took place between the majority and dissenting opinions in *Eddings* itself. But *Eddings* certainly seems to fit the majority's understanding of what constitutes a "new rule." *See* Majority Opinion at 5699 ("If the conclusion is "susceptible to debate among reasonable minds,' the ... decision is a new rule,

26

even if "controlled' or "governed' by the earlier decision.") (quoting *Butler v. McKellar,* 494 U.S. 407, 415, 110 S.Ct. 1212, 1217, 108 L.Ed.2d 347 (1990); and citing *Stringer v. Black,* --- U.S. ----, ---- - ----, 112 S.Ct. 1130, 1140-1141, 117 L.Ed.2d 367 (1992) (Souter, J., dissenting)).

At any rate, the *Penry* Court relies heavily upon *Eddings* in order to provide relief to Mr. Penry, and it applies *Griffith* retroactively in order to do so. If the *Penry* Court had viewed only *Lockett* and *Jurek* as important to its holding, and not *Eddings,* the Court knew how to say so. Instead, *Penry's* plain language clarifies the Court's intention that *Griffith* be given retroactive application to habeas petitioners claiming the entitlement to benefit from "new rules" announced before their convictions and sentences became final. I think we must take the Supreme Court at its word, rather than effectively "picking and choosing" the Supreme Court precedents we will and will not faithfully follow.

The majority views this case as presenting a choice between *Daniel* and *Griffith,* apparently concluding that the two cases are in conflict. I see no such conflict as these opinions relate to Mr. Wilkerson's case.

Mr. Wilkerson was in the state's direct review system, after his jury had been empaneled but before his case had become final, when the *Taylor* was announced by the Supreme Court. Six days after announcing *Taylor,* the Court rendered its decision in *Daniel*—specifically holding that the "*Taylor* rule" should be

applied only to cases in which the juries had not yet been *empaneled* at the time *Taylor* was decided. In *United States v. Johnson,* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982), the Supreme Court holds that a defendant's retroactive entitlement to the benefit of a "new rule" like the one in *Taylor* is dependent upon whether the "new rule" case at issue has a specific, retroactivity-focused companion among the Supreme Court's body of precedents. If it does, as it does here (in the form of *Daniel* ), the companion case will govern the retroactivity question. *Griffith* does not purport to overrule *Johnson,* and as the majority points out, we are not at liberty to presume that it does so *sub silentio.*

In my view, the *"Griffith"* retroactivity approach to "new rule" entitlement claims applies to all cases that were not yet final at the time the "new rule" in question was announced, *unless* (pursuant to *Johnson* ) the issue of the new rule's retroactivity is already settled by precedent—that is, by a specific, retroactivity-focused, companion case. It matters not to this analysis whether one raises entitlement to the benefit of a "new rule" by way of direct review or by way of collateral attack. *See e.g., Teague, supra,* 489 U.S. at 308-309, 310-311, 109 S.Ct. at 1074, 1075-76 (1989) (O'Connor, J. (plurality opinion)).

The majority effectively holds that, in any circumstance, *Teague* bars the retroactive application of the *"Griffith"* retroactivity approach to cases that are on collateral review. This holding stretches *Teague* beyond its elastic limits. *Teague*

28

itself says:

> We ... now adopt Justice Harlan's view of retroactivity for cases on collateral review. [That is,] [u]nless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases *which have become final before the new rules are announced.*

*Teague, supra,* 489 U.S. at 310-311, 109 S.Ct. at 1075 (emphasis added). The most recent cases on point solidify the Supreme Court's position that habeas courts are to set their "new rule" entitlement sights upon the law *as it existed at the time the petitioner's conviction and sentence became final. See e.g., Lockhart v. Fretwell,* --- U.S. ----, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). *See also Gilmore v. Taylor,* --- U.S. ----, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993) (holding that subject to two narrow exceptions, *a case that is decided after a defendant's conviction and sentence have become final* may not provide the basis for federal habeas relief if that case announces a "new rule"). In one of its most recent reflections upon *Teague* (the *Brecht* "harmless error" decision), the Court notes that "new rules" seldom have retroactive application to criminal cases on federal habeas. *Brecht v. Abrahamson,* --- U.S. ----, ----, 113 S.Ct. 1710, 1720, 123 L.Ed.2d 353 (1993). "Seldom" is not the same as "never."

The law appears settled. Assuming no specific, retroactivity-focused "companion case" exists to foreclose application, the following represent the "seldom" areas in which "new rules" are to be applied on § 2254 collateral review:

1. cases not yet final when the "new rule" was announced;

2. cases that had become final before the "new rule" was

29

announced, but which concern a "new rule" that places "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe;"

and

3. cases that had become final before the "new rule" was announced, but which concern a "new rule" requiring the observance of "those procedures that ... are "implicit in the concept or ordered liberty.' "

*See Teague, supra,* 489 U.S. at 310-311, 109 S.Ct. at 1075 ("We ... now adopt Justice Harlan's view of retroactivity for cases on collateral review. [That is,] [u]nless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases *which have become final before the new rules are announced.*") (emphasis added). *See also Teague, supra,* 489 U.S. at 307, 109 S.Ct. at 1073 (quoting *Mackey v. United States,* 401 U.S. 667, 692-693, 91 S.Ct. 1160, 1179-80, 28 L.Ed.2d 404 (1971) (Harlan, J., concurring in judgments in part and dissenting in part);  which in turn quotes *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937) (Cardozo, J.)). Of course, "new rule" benefits so applied will still often be subject to *Brecht* "harmless error" analysis. *See Brecht, supra.*

Thus, in light of *Johnson, supra,* I agree with the majority that *Daniel* prevents Mr. Wilkerson from benefiting from the *Taylor* rule. I regret that the majority has found it necessary to commit the Fifth Circuit to the lonely and novel position that *Teague* effectively forecloses the collateral application of the "*Griffith* " approach to "new rule" retroactivity questions—even when the "new rule" in issue was announced before the petitioner's case became

30

final;  and even when there is no specific, retroactivity-focused,

"companion case" foreclosing such application.