945 F.2d 333
 Mark Roy LILES, Petitioner-Appellee,
v.
James L. SAFFLE, Warden, State Penitentiary at McAlester,
Respondent-Appellant,
and
Gary Maynard, Director, Oklahoma Department of Corrections;
Robert H. Henry, Attorney General of Oklahoma, Respondents.
 No. 90-6380.
 United States Court of Appeals,
Tenth Circuit.
 Sept. 16, 1991.
 
 William J. Mertens of Swidler & Berlin, Chartered, Washington, D.C., and Patti Palmer, Okl. Appellate Public Defender System, Norman, Okl., for petitioner-appellee.
 Robert H. Henry, Atty. Gen. of State of Okl. and A. Diane Hammons, Asst. Atty. Gen., Oklahoma City, Okl., for respondent-appellant.
 Before SEYMOUR and EBEL, Circuit Judges, and BABCOCK,* District Judge.
 SEYMOUR, Circuit Judge.
 
 
 1
 Respondent James L. Saffle appeals from the district court's order granting habeas relief to petitioner Mark Roy Liles, under 28 U.S.C. § 2254, from his conviction for first degree murder and sentence of death.[1] In vacating the conviction, the district court determined that, under Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the state trial court had deprived petitioner of due process by denying his pretrial motion for state funds to employ a psychiatrist in aid of his defense. We affirm.
 
 
 2
 On August 31, 1982, the State of Oklahoma charged petitioner with murder occurring during the commission of an armed robbery. See Okla.Stat.Ann. tit. 21, § 701.7 B. A jury convicted petitioner of first degree murder and sentenced him to death, finding the existence of two aggravating factors: the killing was especially heinous, atrocious, or cruel, and petitioner posed a continuing threat to society. See Okla.Stat.Ann. tit. 21, § 701.12.
 
 
 3
 The Oklahoma Court of Criminal Appeals upheld petitioner's conviction. Liles v. State, 702 P.2d 1025 (Okla.Crim.App.1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2291, 90 L.Ed.2d 732 (1986). He subsequently challenged his conviction and sentence through two state post-conviction proceedings, again without avail. Liles v. State, No. PC-87-391 (Okla.Crim.App. July 9, 1987), cert. denied, 484 U.S. 933, 108 S.Ct. 308, 98 L.Ed.2d 266 (1987); Liles v. State, No. PC-88-589 (Okla.Crim.App. Apr. 25, 1989), cert. denied, 493 U.S. 945, 110 S.Ct. 353, 107 L.Ed.2d 341 (1989).
 
 
 4
 Petitioner then filed this petition for habeas relief in the United States District Court for the Western District of Oklahoma, asserting thirteen grounds for relief. He moved for summary judgment on the ground that the trial court had deprived him of due process by denying his motion for funds to employ a psychiatric expert. The district court granted petitioner's motion for summary judgment, relying upon Ake, 470 U.S. 68, 105 S.Ct. 1087.[2]
 
 
 5
 On appeal, respondent challenges the district court's determination that the trial court deprived petitioner of due process by denying him psychiatric assistance at both the guilt and the sentencing phases of his trial. This court will review an order granting summary judgment de novo. Abercrombie v. City of Catoosa, 896 F.2d 1228, 1230 (10th Cir.1990). Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Id.; Fed.R.Civ.P. 56(c) (1991).
 
 
 6
 The Supreme Court premised its decision in Ake on the principle that "a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense." 470 U.S. at 77, 105 S.Ct. at 1093. Applying that principle to the issue of "whether, and under what conditions, the participation of a psychiatrist is important enough to preparation of a defense to require the State to provide an indigent defendant with access to competent psychiatric assistance in preparing the defense," id., the Court determined that, although
 
 
 7
 [a] defendant's mental condition is not necessarily at issue in every criminal proceeding, ... when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.
 
 
 8
 Id. at 82-83, 105 S.Ct. at 1095-96. Similarly, under certain circumstances, due process also entitles a criminal defendant to court-appointed psychiatric assistance during the sentencing phase of a capital proceeding. Id. at 83-84, 105 S.Ct. at 1096-97.
 
 
 9
 A criminal defendant is entitled to psychiatric assistance at trial when he is able to make "an ex parte threshold showing to the trial court that his sanity is likely to be a significant factor in his defense." Id. at 82-83, 105 S.Ct. at 1095-96. See United States v. Austin, 933 F.2d 833, 841 (10th Cir.1991).[I]f "sanity" or "mental capacity" defenses [are] to be defense issues, they must be established by a "clear showing" by the indigent defendant as "genuine," "real" issues in the case. In order for a defendant's mental state to become a substantial threshold issue, the showing must be clear and genuine, one that constitutes a "close" question which may well be decided one way or the other. It must be one that is fairly debatable or in doubt.
 
 
 10
 Cartwright v. Maynard, 802 F.2d 1203, 1211 (10th Cir.1986) (citing United States v. Sloan, 776 F.2d 926 (10th Cir.1985)), rev'd on other grounds, 822 F.2d 1477, 1478 n. 2 (10th Cir.1987) (en banc), aff'd, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). General allegations supporting a request for court appointment of a psychiatric expert, without substantive supporting facts, and undeveloped assertions that psychiatric assistance would be beneficial to the defendant will not suffice to require the appointment of a psychiatrist to aid in the preparation of a criminal defense. Davis v. Maynard, 869 F.2d 1401, 1407 (10th Cir.1989), vacated on other grounds, --- U.S. ----, 110 S.Ct. 1516, 108 L.Ed.2d 756 (1990); Cartwright, 802 F.2d at 1211.
 
 
 11
 In cases such as this, in which the trial court denied a criminal defendant court-appointed psychiatric assistance prior to the Supreme Court's determination in Ake, but to which Ake 's standard applies, the question presented is whether, "upon review of the entire record, [petitioner] could have made a threshold showing under Ake that 'his sanity at the time of the offense is to be a significant factor at trial....' " Cartwright, 802 F.2d at 1212 (emphasis in original). The record before this court supports the district court's determination that petitioner could have made this showing.[3]
 
 
 12
 The State of Oklahoma charged petitioner with first degree murder on August 31, 1982. He was already in police custody at that time. On February 9, 1983, court-appointed defense counsel applied to the state trial court for a determination of petitioner's competency, asserting that petitioner's "mental state and communications abilities [were] such that they seriously interfere[d] with his understanding of the proceedings against him and with his capability of aiding ... in preparation for trial." State Court Rec., vol. I, at 37. Defense counsel also requested that the trial court waive the notice requirement for the competency hearing, asserting that petitioner "is unable to communicate with his attorney to inform him of any relatives residing within or outside ... Oklahoma." Documentation, Ake claim, exh. 2. The trial court consented to waive the notice requirement. Id.
 
 
 13
 The next day, after conducting a hearing on the application for a competency determination, the trial court ordered petitioner committed to the Oklahoma Department of Mental Health for sixty days for observation and examination, stating "there is a doubt as to the present competency of the said [defendant], by reason of personal observation of the defendant by this Court; and testimony regarding defendant's ability to understand the proceedings against the defendant and the defendant's capability of aiding the attorney in preparation for trial." Id., exh. 1.
 
 
 14
 A month later, R.D. Garcia, M.D., the chief forensic psychiatrist at Eastern State Hospital where petitioner was confined, reported to the trial court that the hospital staff had determined that petitioner was capable of understanding the proceedings against him and of assisting his attorney with his defense and, that "[s]ince it is the consensus of our staff that [petitioner] is not in need of psychiatric treatment, we would therefore consider him as competent to stand trial at this time." Id., exh. 3 at 1. The report also indicated that petitioner had not displayed any behavior that would indicate that he should be considered dangerous to himself or others, "at least not as a result of any overt psychotic symptoms elicited during his period of confinement in the hospital." Id. at 2.
 
 
 15
 The report further noted, however, that petitioner was being treated daily with 150 milligrams of Thorazine, a powerful antipsychotic medication, see Physician's Desk Reference 2116 (44th ed. 1990), as well as 400 milligrams of Tegretal [Tegretol], an anticonvulsant medication, see id. at 988, and four milligrams of Cogentin, a medication used to treat parkinsonism, a common side effect of Thorazine, see id. at 1337. Documentation, Ake claim, exh. 3 at 2. The report to the court "of course recommend[ed] that this treatment be continued in order for [petitioner] to retain his present degree of stability." Id.
 
 
 16
 Relying upon the hospital's evaluation, the state trial court determined that petitioner was competent to stand trial. Evidentiary submission, exh. 3. Petitioner returned to the Oklahoma County jail, where, according to jail records, he was medicated with Haldol, yet another antipsychotic medication, see Physician's Desk Reference at 1282. Documentation, Ake claim, exh. 6.
 
 
 17
 Although Dr. Garcia noted in his report to the court that petitioner was well behaved while confined at the hospital and did not present any management problems, documentation, Ake claim, exh. 3 at 2, Dr. Garcia's notes also reflect that petitioner had to be secluded for combative behavior on February 18 and March 3 and 4, 1983. Id., exh. 5 (state hospital records). In addition, on March 3, the staff also noted "definite sociopathic behavior" from petitioner. Id.
 
 
 18
 On February 25, 26, 27, 28, and 29, the staff had to medicate petitioner with 100-milligram doses of Thorazine in order to control his combative or agitated behavior. Id. Petitioner's behavior continued to require administration of 400 milligrams of Thorazine daily, from March 1 through March 7, when the dosage was reduced to 150 milligrams a day.[4] Id. Dr. Garcia recommended this medication continue after petitioner's release from the hospital. Id., exh. 3 at 2. On the day of his release, March 17, petitioner's agitated behavior required two milligrams of Ativan, an anti-anxiety medication, see Physician's Desk Reference at 2348. Documentation, Ake claim, exh. 5.
 
 
 19
 In addition to this treatment, the hospital staff implemented precautions in caring for petitioner, in light of his depression and threatened suicide. Id. Petitioner also received medication for insomnia and headaches throughout his stay at the hospital. Id.
 
 
 20
 Further notations in the hospital records indicate that, on March 1, petitioner experienced "strong inner feelings of wrath and anger" that he believed to be the product of his being possessed by a "violent alter ego" named Rock. Id. Several days later, petitioner became very angry, stating that he would "kill someone on the ward before the night [was] over," and claiming that he was no longer himself, but had become Rock and that Rock would take care of things. Id. At that time, petitioner claimed Rock had committed the murder. Id.
 
 
 21
 Dr. Garcia noted that petitioner "may be considered potentially dangerous, daring, with temper tantrums and a short fuse, very easily ready to fight, as an aggressive and explosive individual, but not psychotic." Id. Dr. Garcia ultimately diagnosed petitioner as having a dysthmic personality disorder and an intermittent explosive disorder, along with a continuous alcohol dependence and episodic mixed substance abuse. Id. Notations in the records also indicated petitioner suffered from an "organic personality syndrome (intermittent explosive disorder)" and "mild focal brain damage secondary to cerebral trauma." Id.
 
 
 22
 Lance A. Portnoff, Ph.D., a clinical neuropsychologist and a consultant at Eastern Hospital, reported that, after examining and testing petitioner, his findings
 
 
 23
 are suggestive of bilateral tempero-limbic dysfunction secondary to brain trauma and polydrug abuse.... These findings are consistent with the reported episodes of dyscontrol, which can occur with such a locus of damage because of irritation or disinhibition of limbic structures mediating instinctual aggressive drives.... [T]he behavior described by the patient is consistent with an organic intermittent explosive disorder secondary to traumatic contusion of mesial hemisphere structures. Such patients have diminished control over aggressive patterns of response, particularly if further disinhibiting influences such as drugs or alcohol are ingested. Because of the close proximity of limbic aggressive and memory structures, often the irritative effect which triggers tendencies for explosiveness also impairs memory encoding for the duration of the irritative ictus.
 
 
 24
 ....
 
 
 25
 [T]hese test findings are more consistent with a nonpsychotic [rather] than psychotic mental status, characteristic of adjustment disorder of mixed emotional features, organic personality syndrome (intermittent explosive disorder), alcohol abuse, continuous, mixed substance abuse, unspecified, and mild focal brain damage secondary to cerebral trauma.
 
 
 26
 Id.
 
 
 27
 In his subsequent affidavit, Dr. Portnoff further explained that
 
 
 28
 the results of my evaluation [of petitioner in 1983] were consistent with the presence of an organic impairment, or physical dysfunction to [petitioner's] brain. The results suggested the presence of an organic intermittent explosive disorder secondary to traumatic contusion of mesial hemisphere structures. Persons experiencing this problem may have a diminished ability to control aggressive impulses, and, as a result of damage to their brains, they may be capable of explosive, violent behavior during ictal, or seizure-like states. They may then have no memory or impaired memory of their violent behavior.
 
 
 29
 Id., exh. 8 at 1 (Affidavit of Lance A. Portnoff, Ph.D. (March 17, 1990)).
 
 
 30
 In corroboration of Dr. Portnoff's diagnosis, petitioner offered the affidavit of Russell R. Monroe, M.D., a professor of psychiatry at the University of Maryland School of Medicine. After examining petitioner's hospital records, Dr. Monroe
 
 
 31
 concluded that there is a significant possibility that [petitioner] experiences an episodic behavioral disorder associated with a limbic ictus. Such a condition may lead an individual to commit acts of violence over which he lacks control in an ordinary sense, and which are not in an ordinary sense intentional. The possibility of a behavioral disorder associated with a limbic ictus is consistent with the findings in the February 25, 1983 neuropsychological evaluation conducted by L.A. Portnoff, Ph.D.
 
 
 32
 ....
 
 
 33
 In my opinion, further evaluation ... is justified by the significant possibility that if [petitioner] indeed killed Mr. Yarbrough, he did so as a result of a brain disorder that produced a seizure-like event.
 
 
 34
 Id., exh. 9 at 1-2, 3 (Affidavit of Russell R. Monroe, M.D. (October 24, 1988)).
 
 
 35
 In addition to Dr. Portnoff's findings concerning possible mental conditions affecting petitioner, Dr. Portnoff reported, on February 25, 1983, that although petitioner had a factual and rational understanding of the charges against him, because of his depression, he was at that time incompetent to stand trial. Id., exh. 5. In his affidavit, Dr. Portnoff explained that his competency determination was not included in the hospital's report to the trial court because he "was considered a consultant only, and was not a part of the forensic team assigned to [petitioner] at Eastern State Hospital." Id., exh. 8 at 1. Dr. Portnoff further asserted that
 
 
 36
 [a]t that time it was the policy of Eastern State Hospital to report to the trial courts only the opinion on competency of their Chief Forensic Psychiatrist, Dr. R.D. Garcia. Any dissenting views from other staff members were not reported. At that time Dr. Garcia's view of competency to stand trial evaluations would have prevented him from considering either [petitioner's] depression or his apparent brain damage in determining competency. Dr. Garcia was of the belief that only psychotic individuals could be considered incompetent, and any individual who was non-psychotic was therefore competent.
 
 
 37
 ....
 
 
 38
 In the time I was employed at Eastern State Hospital by far most of the patients I saw there I considered to be competent. In my opinion [petitioner's] depression and incompetency [were] very real, and he was in no way malingering.
 
 
 39
 Id. at 1-2.
 
 
 40
 In an effort to suggest possible causes for petitioner's brain injuries, the affidavit of petitioner's mother asserted that he suffered physical and sexual abuse as a child, periods of head banging, head injuries from an automobile accident in which his head went through the windshield, repeated headaches, and episodes of sleepwalking. Evidentiary submission, exh. 29 (Affidavit of LaDonna Meadows (March 21, 1990)). A childhood acquaintance of petitioner also attested to the fact that, when petitioner was fourteen years old, he fell approximately fifteen feet off a cliff, hit his head, and was unconscious for a time. Id., exh. 30 (Affidavit of Chuck Richmond (March 16, 1990)). The hospital records indicate petitioner said that he had suffered repeated minor head trauma from boxing. Documentation, Ake claim, exh. 5.
 
 
 41
 In her affidavits, petitioner's mother also stated that a psychiatrist treated petitioner for a time while he was in elementary school, Affidavit of LaDonna Meadows (June 3, 1987), and that, prior to his joining the Marines at age seventeen, petitioner had serious psychological problems, including exhibiting a split personality, Affidavit of LaDonna Meadows (June 4, 1987). "There were times when [petitioner] would only respond to you if you called him by the name of 'Rock.' There were times that he would disappear into the woods for days, and not remember much about it." Evidentiary submission, exh. 29 at 4. Petitioner's mother further attested that, while petitioner was in the Marines, she received notice from the Marine Corps that he had received psychiatric treatment. Id.
 
 
 42
 Petitioner's mother chronicled several episodes of explosive violence occurring throughout petitioner's life. He had, at various times, attempted to strike his mother, attempted to cut his brother with a broken bottle, and threatened to shoot his brother. Affidavit of LaDonna Meadows (June 3, 1987). He had also beaten his girlfriend, then disappeared for several days, finally emerging from the woods in a dazed state. Id. Petitioner's mother also witnessed occurrences suggesting to her that petitioner had killed his prized pet pit bulls. Id. When asked about the pets, petitioner insisted someone had killed them while he was away from home. Id.
 
 
 43
 Immediately preceding the murder, petitioner's pregnant wife had left him. Affidavit of LaDonna Meadows (June 4, 1987). Petitioner, according to his mother's affidavit, fell into a deep depression and again was found wandering dazed in the woods. Id. At the time of the murder, petitioner was in Oklahoma searching for his wife. Id.
 
 
 44
 In light of petitioner's history of mental problems, his treatment with antipsychotic medication, and the conflicting diagnoses of his incompetency and his mental condition in general, this record sufficiently supports the district court's determination that petitioner could have made a sufficient showing, under Ake, that his sanity was likely "to be a significant factor at trial." See Cartwright, 802 F.2d at 1212.
 
 
 45
 Respondent contends that petitioner cannot claim the state court's denial of a court-appointed psychiatrist deprived him of due process because he failed to assert an insanity defense at trial, unlike the defendant in Ake who presented an insanity defense even though the trial court had denied him psychiatric assistance. See 470 U.S. at 72, 105 S.Ct. at 1090. In his motion seeking state funds in order to employ a psychiatrist or psychologist, defense counsel did assert that he had
 
 
 46
 reason to believe that [petitioner] suffers from mental disease or defect, that would affect his capacity to appreciate the wrongfulness of his conduct or conform his [conduct to the] requirements [of the] law.
 
 
 47
 ....
 
 
 48
 The need for a psychologist [or] psychiatrist is clear.... Clearly, there is a need to determine whether [petitioner] had the ability to distinguish right from wrong at the time he allegedly committed these particular acts. A determination of this fact is relevant and material in determining guilt. It is further necessary for determining mitigating circumstances as authorized in 21 O.S.1976 Supp. § 701.10.
 
 
 49
 Evidentiary submission, exh. 4 at 2.
 
 
 50
 In Ake, the Supreme Court held that, upon the requisite showing, a criminal defendant will be entitled to "access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." 470 U.S. at 83, 105 S.Ct. at 1096 (emphasis added). One of the functions of such a court-appointed psychiatric expert, therefore, is to assist the defense in determining whether an insanity defense is viable or warranted under the circumstances of a particular case. Id. at 82, 105 S.Ct. at 1095; see also Smith v. McCormick, 914 F.2d 1153, 1157 (9th Cir.1990); United States v. Fazzini, 871 F.2d 635, 637 (7th Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 517, 107 L.Ed.2d 518 (1989). "The right to psychiatric assistance ... means the right to use the services of a psychiatrist in whatever capacity defense counsel deems appropriate--including to decide, with the psychiatrist's assistance, not to present to the court particular claims of mental impairment." Smith, 914 F.2d at 1157. Petitioner is therefore not precluded from asserting a due process challenge to the denial of his motion seeking a court-appointed psychiatrist simply because he did not proceed with an insanity defense after the denial of his motion for court-appointed psychiatric assistance. Indeed as the Court recognized in Ake, given the complex nature of mental disease, "the testimony of psychiatrists can be crucial and 'a virtual necessity if an insanity plea is to have any chance of success.' " Ake, 470 U.S. at 81, 105 S.Ct. at 1095 (citation omitted).
 
 
 51
 Respondent next argues that petitioner cannot establish his entitlement to psychiatric assistance at the penalty phase of his trial because the state did not present any psychiatric evidence concerning the aggravating factor of petitioner's future dangerousness. In Ake, the Supreme Court determined that the state court had deprived the defendant of due process by denying him court-appointed psychiatric assistance in "presenting evidence to rebut the State's evidence of his future dangerousness." 470 U.S. at 83, 105 S.Ct. at 1096. The Court held that due process entitles a criminal defendant to psychiatric assistance "when the State presents psychiatric evidence of the defendant's future dangerousness." Id. Although the Court discussed the necessity of psychiatric assistance to enable a defendant to respond to and challenge the state's psychiatric evidence concerning defendant's future dangerousness, the Court did not expressly limit a defendant's right of psychiatric assistance to situations where the state first presents psychiatric evidence. See id. at 83-84, 105 S.Ct. at 1096-97. Rather, the Court stated that "[t]he variable on which we must focus is ... the probable value that the assistance of a psychiatrist will have in this area, and the risk attendant on its absence." Id. at 84, 105 S.Ct. at 1096. In this case, because the state presented evidence concerning petitioner's future dangerousness, albeit not psychiatric evidence, and because petitioner established the likelihood that his mental condition could have been a significant mitigating factor, the district court correctly determined that the state trial court deprived petitioner of due process by denying him court-appointed psychiatric assistance at the sentencing phase of his trial.
 
 
 52
 The judgment of the United States District Court for the Western District of Oklahoma granting petitioner habeas relief is AFFIRMED. The stay of the district court's order is dissolved. Respondents are to release petitioner from custody on the ninety-first day following the date of this opinion unless, within ninety days from the date of this opinion, the State of Oklahoma has elected to retry petitioner.
 
 
 
 *
 Honorable Lewis T. Babcock, District Judge, United States District Court for the District of Colorado, sitting by designation
 
 
 [1]
 After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed.R.App.P. 34(a); 10th Cir.R. 34.1.9. The case is therefore ordered submitted without oral argument
 
 
 [2]
 Because the United States Supreme Court decided Ake while petitioner's direct appeal was pending, this case does not present a retroactivity issue. See Griffith v. Kentucky, 479 U.S. 314, 322-23, 107 S.Ct. 708, 712-13, 93 L.Ed.2d 649 (1987). Further, the parties do not dispute that petitioner has exhausted his state court remedies concerning the issue presented by this appeal. See generally White v. Meachum, 838 F.2d 1137, 1138 (10th Cir.1988)
 
 
 [3]
 We have supplemented the record on appeal with petitioner's Documentation of Ake Claim and his Evidentiary Submission, both filed with the district court. See 10th Cir.R. 10.2.4
 
 
 [4]
 In his dissent to the affirmance of petitioner's conviction on direct criminal appeal, Judge Parks noted that petitioner's treatment with antipsychotic medication should have indicated to the trial court that there were serious concerns presented regarding petitioner's mental condition
 [T]he psychiatric report indicated that during the period of the psychiatric examination, the [petitioner] was being maintained on 150 milligrams of Thorazine per day. Thorazine is an extremely powerful psychotropic drug. Its most common use is for the management of manifestations of psychotic disorders. See Physician's Desk Reference (39th Ed.Barnhart 1985), at 1977. In a special warning box, the Physician's Desk Reference states that Thorazine "is not the first drug to be used in therapy for most patients with non-psychotic anxiety because certain risks associated with its use are not shared by common alternative treatments.... When used in the treatment of non-psychotic anxiety [it] should not be administered in doses of not [sic] more than 100 mg. per day...." Id. Therefore, assuming that the State's doctors were following standard medical practice, the fact that [petitioner] was being maintained on 150 milligrams of Thorazine per day strongly indicates that the doctors were concerned with "the management of manifestations of psychotic disorders." [Further], the psychiatric report recommended that the [petitioner] continue his Thorazine treatment "in order for him to retain his present degree of stability." The fact that Thorazine therapy was administered during the [petitioner's] psychiatric examination and the recommendation for continuation belie the psychiatric report's assertion that the [petitioner] was "not in need of psychiatric treatment," and indicate that the doctors entertained serious concern about his mental stability.... [T]he doctor's concern about [petitioner's] mental condition was further illustrated by the fact that the psychiatric report suggested that [petitioner] be referred "to a mental health clinic in his locale for follow-up care on an out-patient basis as might be indicated."
 Liles, 702 P.2d at 1039.