Revised September 17, 1998

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-41438
_____


ROBERT EXCELL WHITE,

Petitioner-Appellant,

v.

GARY L JOHNSON, DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, INSTITUTIONAL DIVISION,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Eastern District of Texas
_____
August 26, 1998
Before KING, DAVIS, and WIENER, Circuit Judges.

KING, Circuit Judge:

Petitioner-appellant Robert Excell White, a Texas death row
inmate convicted of capital murder, appeals the district court's
denial of his petition for a writ of habeas corpus.  White
contends that the district court erred in denying his petition
because the trial court violated the mandate of Ake v. Oklahoma,
470 U.S. 68 (1985), by denying his motion for the appointment of
a psychiatrist to aid him during the sentencing phase of his
trial, thereby denying him due process of law and rendering the
assistance provided by his trial counsel unconstitutionally

ineffective.  Because we conclude that any Ake error that may have occurred in this case was harmless, we affirm.

## I.  FACTUAL BACKGROUND

On May 10, 1974, petitioner-appellant Robert Excell White, who at the time lived in Waco, Texas, began drinking alcohol at a local tavern around noon and continued until 1:00 a.m.  He then took his wife home and proceeded to the home of Roy Perryman where he continued to drink.  After drinking and talking with Perryman for a while, White pulled a knife that Perryman had sharpened for him from its scabbard and stabbed Perryman to death, stating, "Roy, I hate for it to end like this, but its [sic] your time to go."  White then stole several firearms belonging to Perryman and left his home.

Shortly after killing Perryman, White left Waco with Gary Dale Livingston and subsequently met up with Gary Livingston's brother, James Livingston, at a motel on Interstate 35.  The three proceeded north to McKinney, Texas.  White and the Livingston brothers discussed robbing a store, and White observed that they would be unable to leave any witnesses to the robbery alive.  They then proceeded approximately three miles east on Highway 380 to a gas station and convenience store named Hill Top Grocery, where they arrived at approximately 6:30 a.m.

The station owner, 73-year-old Preston Broyles, began pumping gas into White's car.  Gary Coker and Billy St. John,

both eighteen years old, had stopped to put oil in their truck at the station.  White exited the car with a .30 caliber Plainfield carbine machine gun and ordered Broyles, Coker, and St. John into the station office.  White ordered Broyles to open the cash register and ordered Broyles, Coker, and St. John to hand over their wallets.  One of the robbery victims made a comment that apparently angered White.  White responded, "I wished you hadn't said nothing, I'm going to kill you."  James Livingston aimed a .22 caliber pistol at the victim who had made the comment, and White shoved him out of the way, stating, "He's mine."  White then repeatedly shot Broyles, Coker, and St. John, killing all three of them.  Just prior to shooting the last of the victims, who was begging for his life, White stated, "Goddammit, you've got to go too, I'm not going to leave any witnesses."  White and the Livingstons then returned to Waco, and the three divided up the proceeds of the robbery, with each of them receiving $65.

After returning to Waco, James Livingston parted company with White and Gary Livingston, who left town for California. They made it as far as Abilene, Texas and then decided to return to Waco.  While in Waco, White and Gary Livingston threw the machine gun used in the Hill Top Grocery murders into the Brazos River.  They then got some clothing and headed for Mississippi. Somewhere along the way, White got angry at Gary Livingston and threatened to shoot him.  Gary Livingston asked to get out of the car, and White left him in Tyler, Texas.

3

White arrived at his cousin Johnny White's home in Cleveland, Mississippi on May 14, 1974. White told Johnny White about what had happened at Hill Top Grocery and also stated that he intended to kill a Mississippi judge known as Judge Micky, who had been involved in a previous criminal conviction of White. Johnny White convinced him to surrender to law enforcement authorities at the Boliver County Sheriff's Department. White gave statements to Mississippi and Texas law enforcement officers implicating himself in the Hill Top Grocery murders both at the Mississippi jail and during the trip back to Texas.

## II.  PROCEDURAL BACKGROUND

On May 24, 1974, a Collin County grand jury indicted White and the Livingston brothers for the capital murder of Broyles, Coker, and St. John. After a jury trial, White was found guilty of the capital murder of Broyles and sentenced to death. The Texas Court of Criminal Appeals affirmed White's conviction and sentence on July 14, 1976, see White v. State, 543 S.W.2d 104 (Tex. Crim. App. 1976), and the Supreme Court denied his petition for a writ of certiorari, see White v. Texas, 430 U.S. 988 (1977). White subsequently challenged his conviction collaterally through two state applications for a writ of habeas corpus. The Texas Court of Criminal Appeals granted the second such motion on the ground that White had been impermissibly compelled to undergo a government psychiatric examination, the

4

results of which were used against him at trial, in violation of Estelle v. Smith, 451 U.S. 454 (1981), and vacated his conviction.

On the same date that the Texas Court of Criminal Appeals granted White's application for a writ of habeas corpus, the trial court appointed counsel for White and again set the case for trial. The trial began on June 8, 1987, and the jury returned a guilty verdict. After the punishment phase, the jury answered the special issues submitted to it pursuant to article 37.071 of the Texas Code of Criminal Procedure in the affirmative.[1] The trial court accordingly sentenced White to death. The Texas Court of Criminal Appeals affirmed White's conviction on direct appeal, and the Supreme Court denied his petition for a writ of certiorari, see White v. Texas, 507 U.S. 975 (1993).

White filed his first federal habeas petition in 1993, and the district court dismissed it without prejudice on May 11,

---

[1] At the time of White's trial, the special issues mandated by article 37.071 were as follows:

   (1)  whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

   (2)  whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society . . . .

TEX. CODE CRIM. PROC. ANN. art. 37.071 (Vernon 1981) (amended in 1985).

1994, to allow White to exhaust his state remedies on the claims presented. White then filed a state application for habeas relief, which the Texas Court of Criminal Appeals denied on July 12, 1994. On July 14, 1994, White filed another federal habeas petition, asserting the same claims presented in his state habeas application, and a motion to stay execution. On July 15, 1994, the district court granted White's motion for a stay. On November 7, 1997, the district court adopted the magistrate judge's report and recommendation that White's habeas petition be denied. See White v. Director, TDCJ-ID, 982 F. Supp. 1257, 1258 (E.D. Tex. 1997). White filed a notice of appeal and an application for a certificate of probable cause (CPC) on November 24, 1997, and the district court granted White a CPC on December 12, 1997. White now appeals the district court's denial of his petition for habeas relief.

### III. DISCUSSION

On appeal, White contends that he is entitled to habeas relief on two grounds: (1) the trial court committed constitutional error by denying his request for the appointment of a psychiatrist to aid with his defense at the punishment phase of his trial and (2) the court's failure to appoint such a psychiatrist rendered the assistance provided by his counsel unconstitutionally ineffective. We consider each of these arguments in turn.

6

## A. Failure to Appoint a Psychiatrist

In Ake v. Oklahoma, 470 U.S. 68 (1985), the Supreme Court held that the state has a constitutional obligation to provide an indigent criminal defendant with access to the assistance of a psychiatrist in the following two circumstances: (1) "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial" and (2) "in the context of a capital sentencing proceeding, when the State presents psychiatric evidence of the defendant's future dangerousness." Id. at 83.

Based upon his belief that the state would offer psychiatric evidence to establish his future dangerousness during the punishment phase of his trial, White made a motion for the appointment of a psychiatrist. The trial court offered White the following options: (1) a simultaneous, joint examination conducted by a government psychiatrist and a psychiatrist of White's choosing or (2) an examination by a court-appointed psychiatrist who would then report to the trial court, the prosecution, and White. White declined both options and the trial court therefore denied his motion.

White contends that the options offered by the trial court did not satisfy Ake because they forced him to make a choice between exercising his due process and equal protection-based rights to psychiatric assistance and his Fifth Amendment

7

privilege against self-incrimination.  He bases this argument on the fact that both options proposed by the trial court would have resulted in full disclosure of the results of the examination and any incriminating statements made by White during the examination to the state.  The state concedes that its intention to offer psychiatric evidence of White's future dangerousness was sufficient to vest White with a right to psychiatric assistance under Ake.  However, it contends that the options proposed by the trial court were sufficient to satisfy Ake.  For the reasons set forth below, we conclude that we need not reach the issue of whether the options posed by the trial court satisfied Ake because, assuming arguendo that they did not, the error was harmless.[2]

---

[2]   The district court in this case accepted the magistrate judge's conclusion that this court's decision in Granviel v. Lynaugh, 881 F.2d 185 (5th Cir. 1989), mandates a conclusion that the trial court did not commit Ake error in this case.  In Granviel, this court addressed a constitutional challenge to article 46.02 of the Texas Code of Criminal Procedure.  See id. at 191.  At the time pertinent to Granviel, article 46.02 provided that the "court may at its discretion appoint disinterested experts to examine the defendant with regard to his present competency to stand trial and as to his sanity."  TEX. CODE CRIM. PROC. ANN. art. 46.02, § 2(f)(1), historical notes (Vernon 1979) (amended 1975).  The trial judge appointed an expert pursuant to this statute.  See Granviel, 881 F.2d at 191.  Shortly before the petitioner's trial, article 46.02 was amended to provide that "[a] written report of the examination [conducted by the appointed expert] shall be submitted to the court within 30 days of the order of examination, and the court shall furnish copies of the report to the defense counsel and the prosecuting attorney."  TEX. CODE CRIM. PROC. ANN. art. 46.02, § 3(d) (Vernon 1979).  Pursuant to the amended statute, the trial court ordered release of the appointed expert's report to the state.  See Granviel, 881 F.2d at 191.

8

The petitioner in <u>Granviel</u>, who raised an insanity defense during the guilt phase of his trial, claimed in his petition for habeas relief that the procedure established by article 46.02 was insufficient to satisfy <u>Ake</u> because it authorized disclosure of the psychiatrist's report to the state. <u>Granviel</u>, 881 F.2d at 191. This court rejected the petitioner's contention, concluding that the appointment of a disinterested expert satisfied <u>Ake</u>'s mandate that the state guarantee criminal defendants access to "'the raw materials integral to the building of an effective defense.'" <u>Id</u>. at 192 (quoting <u>Ake</u>, 470 U.S. at 77). The court further rejected the defendant's contention that the admission of the testimony of the psychiatrist who conducted the examination against him at trial violated his Fifth Amendment privilege against self-incrimination because the petitioner had placed his mental state at issue by pleading insanity. <u>See</u> <u>id.</u> at 190.

In his report and recommendation, the magistrate judge concluded that <u>Granviel</u> is controlling in this case. However, this case is at least arguably distinguishable from <u>Granviel</u>. When a criminal defendant pleads an insanity defense and offers psychiatric evidence in support thereof, he places his mental state at issue. This court has long recognized that "a defendant who puts his mental state at issue with psychological evidence may not then use the Fifth Amendment to bar the state from rebutting in kind." <u>Schneider v. Lynaugh</u>, 835 F.2d 570, 575 (5th Cir. 1988). This rule rests upon the premise that "[i]t is unfair and improper to allow a defendant to introduce favorable psychological testimony and then prevent the prosecution from resorting to the most effective and in most instances the only means of rebuttal: other psychological testimony." <u>Id.</u> at 576.

In this case, White did not place his own mental state at issue; rather, the state did so by offering psychiatric evidence of his future dangerousness. As indicated <u>infra</u>, White sought the appointment of an independent psychiatrist merely as a means of counterbalancing the state's evidence. It may be the case that by offering rebuttal psychiatric testimony based upon an out-of-court psychiatric examination the results of which the state was not privy to, White would have sacrificed any Fifth Amendment right he otherwise possessed to decline to submit to a state psychiatric examination the results of which could be used against him at trial. <u>See</u> <u>Estelle v. Smith</u>, 451 U.S. 454, 461-69, 472 (1981) (holding that the admission of statements made by the defendant during a pretrial psychiatric examination violated his Fifth Amendment privilege against compelled self-incrimination because he was not advised before the examination that he had a right to remain silent and that any statement that

9

### 1. Applicability of harmless-error analysis to the alleged <u>Ake</u> error

To date, this court has not squarely addressed the question of whether <u>Ake</u> error is amenable to harmless-error analysis, though in <u>Volson v. Blackburn</u>, 794 F.2d 173 (5th Cir. 1986), we implied that a habeas petitioner must make some showing of "prejudice" in order to be entitled to habeas relief on the basis of <u>Ake</u> error. <u>See</u> <u>id.</u> at 176. Three other circuits have expressly concluded that <u>Ake</u> error is subject to harmless-error analysis, and we now join them. <u>See</u> <u>Tuggle v. Netherland</u>, 79 F.3d 1386, 1388 (4th Cir. 1996); <u>Brewer v. Reynolds</u>, 51 F.3d 1519, 1529 (10th Cir. 1995); <u>Starr v. Lockhart</u>, 23 F.3d 1280, 1291 (8th Cir. 1994).

---

he made could be used against him at a capital-sentencing hearing, but noting that "a different situation arises where a defendant intends to introduce psychiatric evidence at the penalty phase"). However, in this case, it was not even especially clear that White intended to offer psychiatric testimony from the psychiatrist whose appointment he sought from the trial court. Rather, he may have simply used the psychiatrist's assistance in formulating a cross-examination of the state's psychiatrist. In such a circumstance, it is not clear that the trial court could properly condition White's access to psychiatric assistance upon submission to a psychiatric examination the results of which would be immediately accessible to the state. As indicated <u>infra</u>, however, we need not resolve this issue because, even assuming that the trial court committed <u>Ake</u> error by so conditioning White's access to the assistance of a psychiatrist, such error was harmless. We therefore decline to resolve the issue of whether the trial court actually committed <u>Ake</u> error.

Whether a particular constitutional error is subject to harmless-error analysis hinges upon whether the error constitutes "trial error" or "structural error."  Trial error is error that "'occur[s] during the presentation of the case to the jury.'" Brecht v. Abrahamson, 507 U.S. 619, 629 (1993) (brackets in original) (quoting Arizona v. Fulminante, 499 U.S. 279, 307-08 (1991)).  Such error "is amenable to harmless-error analysis because it 'may . . . be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial].'"  Id. (ellipses and brackets in original) (quoting Fulminante, 499 U.S. at 307-08).  "Structural error" is error "affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." Fulminante, 499 U.S. at 310.  By its very nature, structural error "def[ies] analysis by 'harmless-error' standards."  Id. at 309.

The Supreme Court has observed that classification of an error as structural, and therefore not subject to review for harmlessness, is "the exception and not the rule."  Rose v. Clark, 478 U.S. 570, 578 (1986).  "[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis."  Id. at 579.

As noted earlier, Ake recognizes a constitutional right on the part of a criminal defendant to the assistance of a

11

psychiatrist in two general circumstances: (1) "when [the] defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial," and (2) "when the State presents psychiatric evidence of the defendant's future dangerousness" during a capital sentencing hearing. Ake, 470 U.S. at 83. In this case, as White himself concedes in his reply brief, we need only concern ourselves with the potential harmlessness of a trial court's error in denying a request for the assistance of a psychiatrist in developing a defense on the issue of future dangerousness during the punishment phase of trial because this was the only basis upon which White predicated his request for expert psychiatric assistance.[3] See Williams v. Collins, 989 F.2d 841, 844 n.10 (5th Cir. 1993) (noting in dicta that, "in evaluating an Ake

---

[3] At the pretrial hearing at which the trial court addressed White's request for the appointment of a psychiatrist, the trial court asked whether "there [was] some question of competency of Mr. White to stand trial, or some question about whether he was insane at the time of the alleged offense." White's counsel responded as follows:

> I don't have any question about the first question the Court raises about his competency to stand trial at this point. But his mental state at the time of the offense, there might be some question, and that is one thing which we would want to have a psychiatrist appointed.

This statement alone was plainly insufficient to support the appointment of a psychiatrist to assist in the development of an insanity defense. See Volson v. Blackburn, 794 F.2d 173, 176 (5th Cir. 1986) ("Ake requires that the defendant, at a minimum, make allegations supported by a factual showing that the defendant's sanity is in fact at issue in the case.").

12

claim, we should look only to the evidence before the trial judge at the time he ruled on the request for psychiatric assistance"); Messer v. Kemp, 831 F.2d 946, 960 (11th Cir. 1987) (en banc) (evaluating an Ake claim by "examining the information before the trial judge when he denied the defendant's motion for the appointment of an independent psychiatrist").

White's motion requesting the appointment of a psychiatrist merely stated the following:

> This case involves complex issues of fact. It is necessary for the defendant's counsel to have full access to an accurate knowledge of the facts involved in the case in order to render effective assistance to the defendant in the preparation and trial of this case. Such knowledge can come only through the concentrated efforts of an experienced psychiatrist.

During a pretrial hearing on this and other motions, White's counsel clarified the basis of his request for the appointment of a psychiatrist as follows:

> Your Honor, its [sic] our feeling that the State is going to attempt to offer psychiatric testimony at the punishment phase of the case, if the punishment phase is reached, to bear on the question of how the jury will be [asked] by the State to answer the Special Issues which will be submitted to them on the punishment phase, if there is a punishment phase.
>
> . . . [I]t would be our position that the Defendant, in fairness, should be granted our own expert psychiatric witness who would examine the Defendant and come to some conclusions about his mental state and questions of future dangerousness in order to have a balanced view presented to the jury in the punishment phase, if there is a punishment phase.
>
> Of course we would want to, and our motion is predicated upon the Court's cloaking the expert with the attorney/client privilege.

13

We have little difficulty concluding that the trial court's refusal to appoint an independent psychiatrist to examine White without disclosure to the state on the grounds White advanced in support of his request for such an appointment was trial error subject to harmless-error analysis if it in fact constituted error at all.  White's right to the assistance of a psychiatrist in this case was predicated upon the fact that the state intended to, and did, introduce psychiatric testimony regarding future dangerousness.  Absent such testimony by the state, White would have had no constitutional right under Ake to the appointment of a psychiatrist.  Thus, if the state's admission of psychiatric testimony is subject to harmless-error analysis, then the purported Ake error is likewise subject to harmless-error analysis.

The Supreme Court has held that the erroneous admission of psychiatric testimony is subject to harmless-error analysis.  See Satterwhite v. Texas, 486 U.S. 249, 257-58 (1988); see also Brown v. Butler, 876 F.2d 427, 430-31 (5th Cir. 1989).  Such error constitutes trial error because the effect of the erroneous admission of evidence is generally capable of being "quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial]."  Fulminante, 499 U.S. at 307-08.  Therefore, we conclude that Ake error of the type alleged by White likewise constitutes trial error and is therefore subject to harmless-error analysis.

14

White argues, however, that the effect of the purported <u>Ake</u> error in this case was greater than the effect of the mere erroneous admission of psychiatric testimony offered by the state and that the purported error therefore constitutes structural error.  In support of this contention, White argues that he was entitled to the appointment of a psychiatrist based solely upon the fact that his future dangerousness was a significant issue during the punishment phase of his trial.  He therefore contends that he was entitled to the assistance of a psychiatrist regardless of whether the state offered psychiatric evidence of future dangerousness and thus that the impact of the court's purported error was much broader than the admission of the state's psychiatric evidence, encompassing the more-difficult-to-quantify assistance that a psychiatrist could have provided in preparing White's defense.

At the core of White's argument is a contention that all Texas capital defendants are entitled to the appointment of a psychiatrist because their future dangerousness will always be a significant factor during the punishment phase of trial.  This is so because, under Texas's capital sentencing scheme, both at present and at the time of White's trial, imposition of the death penalty requires that the state prove beyond a reasonable doubt that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."  TEX. CODE CRIM. PROC. ANN. § 37.071 (Vernon &

Supp. 1998). However, we recently rejected this contention in Goodwin v. Johnson, 132 F.3d 162 (5th Cir. 1997). There, we explained,

> In Ake, the Court indicated that the due process entitlement to the assistance of a psychiatrist when the state presents psychiatric evidence of future dangerousness is predicated upon the notion that psychiatric testimony offered on behalf of the defendant is uniquely capable of 'uncover[ing], recogniz[ing], and tak[ing] account of . . . shortcomings in predictions' made by the state's psychiatrists.

Id. at 188-89 (brackets in original) (quoting Ake, 470 U.S. at 84). We further noted, and reiterate here, that "[i]t is simply not the case that . . . nonpsychiatric evidence of future dangerousness . . . , such as [the defendant's] criminal history and [statements by the defendant indicating a lack of remorse], are uniquely capable of being rebutted only by psychiatric testimony." Id. at 189.

We acknowledged in Goodwin that a few other circuits have adopted a more expansive reading of Ake, holding that a defendant may be entitled to the appointment of a psychiatrist in some circumstances in which the state offers only nonpsychiatric evidence of future dangerousness. See id. (citing Clisby v. Jones, 960 F.2d 925, 929 n.7 (11th Cir. 1992), and Liles v. Saffle, 945 F.2d 333, 340-41 (10th Cir. 1991)). However, even under the expansive reading of Ake adopted by these circuits, a defendant must establish that "his mental condition could have been a significant mitigating factor." Liles, 945 F.2d at 341;

16

see also Clisby, 960 F.2d at 929 ("Ake requires a state to provide the capital defendant with such access to a competent psychiatrist upon a preliminary showing to the trial court that the defendant's mental status is to be a significant factor at sentencing."). As was the case in Goodwin, White made no such showing to the trial court. See Goodwin, 132 F.3d at 189-90. The conclusory allegation contained in White's motion for the appointment of a psychiatrist that such an appointment "[was] necessary for [White's] counsel to have full access to an accurate knowledge of the facts involved in the case" was insufficient of itself to demonstrate White's entitlement to the appointment of a psychiatrist. See Volanty v. Lynaugh, 874 F.2d 243, 245-47 (5th Cir. 1989) (holding that a motion for the appointment of a psychiatric expert based on an allegation that the defendant was temporarily insane at the time of the offense as a result of drug use was insufficient to support an Ake claim absent additional supporting evidence); Volson, 794 F.2d at 176 (holding that an attorney's "conclusional allegation" that his client "was unable to understand the difference between right and wrong at the time of the offense" was insufficient to entitle him to the appointment of a psychiatrist under Ake). Further, when asked by the trial court to clarify the basis on which he sought the appointment of a psychiatrist, White merely stated that he was entitled to the appointment of a psychiatrist based on the fact that the state intended to present psychiatric evidence and

17

made no additional factual showing evidencing his entitlement to the appointment of a psychiatrist on any other basis.

Because White did not make a showing to the trial court that he was entitled to expert psychiatric assistance on any basis other than the fact that the state intended to present psychiatric evidence regarding his future dangerousness, he had no right to the assistance of a psychiatrist but for the state's offering psychiatric evidence regarding his future dangerousness. See Williams, 989 F.2d at 844 n.10; Messer, 831 F.2d at 960; cf. Ake, 470 U.S. at 83 (noting that an indigent defendant has a constitutional right to the appointment of a psychiatrist "when the defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial" (emphasis added)). Thus, assuming that the trial court committed Ake error by (1) conditioning the appointment of a psychiatrist on White's submission to a mental examination and state access to the results thereof and (2) allowing the state to present psychiatric evidence, such error would have been cured had the court simply precluded the state from admitting psychiatric evidence. As noted earlier, the erroneous admission of psychiatric evidence during a capital sentencing hearing is subject to harmless-error analysis. See Satterwhite, 486 U.S. at 257-58. We therefore proceed to a determination of whether the admission of such evidence was harmless in this case.

18

**2. Harmlessness of the alleged <u>Ake</u> error**

White's <u>Ake</u> claim is before us in the context of a collateral attack on a final state judgment of conviction and sentence. Interests of comity and federalism, as well as "the State's interest in the finality of convictions that have survived direct review within the state court system" mandate that the alleged <u>Ake</u> error does not entitle White to habeas relief unless it "'had a substantial and injurious effect or influence in determining the jury's verdict.'" <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623, 635 (1993) (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)). We conclude that it did not.

During the penalty phase of White's trial, the state's psychiatric evidence consisted of the testimony of Dr. Ronald Markman, who testified on the basis of a hypothetical scenario predicated upon the evidence adduced during both the guilt and punishment phases of White's trial, that a person who had engaged in the type of violent criminal activity in which the evidence indicated White had engaged has an antisocial personality disorder and poses a risk of future dangerousness. Specifically, Dr. Markman testified as follows during direct examination:

> Q: Okay if you were going to use a one to ten scale of sociopaths, because you indicated there are some people that actually meet the diagnostic criteria that are actually functioning in our society without being criminals, and one being the mildest form of antisocial personality disorder,

19

mildest towards society, and ten being the extremest [sic] form of antisocial personality where would you place the individual in our hypothetical question?

A:   In the 9 or 10 area.

Q:   Extreme end [of] the spectrum?

A:   That's right.

Q:   Is such a person dangerous?

A:   In the presence of past dangerous activity, the answer is yes.

Q:   Okay, at least if you were to cut off your inquiry in 1974, let's just go back 13 years in time and you are sitting here and we are all sitting here, was that person dangerous in 1974?

A:   Clearly, yes.

Q:   How dangerous?

A:   Dangerous to the point that he would have to be segregated in order to make the society safe.

Q:   Something would have to be done to protect society from him?

A:   That's right.

Q:   Now you have indicated that there is no cure; is that correct?

A:   Nothing that could alter the behavioral pattern, no.  Not at this time.

     . . .

Q:   . . . I am going to ask you whether or not you have an opinion, based upon reasonable medical certainty, as to whether or not there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society right now?

     . . .

20

A:    In my [o]pinion, with the information at hand, it suggests a high possibility of recidivistic activity, and, therefore, would qualify as being dangerous to society at large.

Q:    You consider it probabl[e] that that person would commit criminal acts of violence in the future?

      . . .

A:    Yes.

During closing argument, counsel for the state focused to some degree upon Dr. Markman's testimony, particularly Dr. Markman's quantification of White's degree of sociopathy. Additionally, counsel for the state noted that Dr. Markman's testimony was unrefuted and that White could have put on psychiatric evidence of his own had he chosen to do so.

Assuming that the trial court's refusal to appoint a psychiatrist to examine White privately rendered the admission of Dr. Markman's testimony error, we cannot conclude that such error had a substantial and injurious effect on the jury's answers to the special issues presented pursuant to article 37.071 of the Texas Code of Criminal Procedure. Prior to Dr. Markman's testimony, the jury heard a tremendous amount of additional non-psychiatric evidence that, in all likelihood, rendered Dr. Markman's medical opinion that White posed a threat of future dangerousness a foregone conclusion in the minds of the jurors.

During the guilt phase of White's trial, Gerald Kunkle, a former deputy sheriff of Collin County and one of the law enforcement officers responsible for transporting White back to

21

Texas after he surrendered to law enforcement authorities in Mississippi, testified that during the trip back to Texas, White indicated that he felt no remorse for his killings. He further testified that when he asked White how he felt about the Hill Top Grocery murders, White responded that they were "[j]ust like stepping on a fly."

At the punishment phase of White's trial, Glenda McFadden, to whom White was married in the early 1970s, testified that White beat her and threatened to kill her. She also testified that she witnessed him beating another of his former wives who was in her third trimester of pregnancy at the time. Ira Lee Bragg testified that, on September 22, 1972, White invited him into White's apartment for a beer and that, while he and a few others were talking amicably, White approached him from behind and, without provocation, cut his throat with a hunting knife.

The jury heard considerable evidence of White's murder of Roy Perryman, including White's detailed confession thereto. Johnny White, White's cousin, testified that, after arriving at his home in Mississippi following the Hill Top Grocery murders, White told him that he had killed Perryman because "[h]e had been dreaming of killing somebody, and he wanted to kill him to see how it was." Howard Alford, a Texas Ranger who was one of the law enforcement officers who transported White from Mississippi back to Texas after his surrender, testified that during his

22

confession to the murder of Perryman, White seemed proud of what he had done.

Johnny White further testified that, when White came to his home after the Hill Top Grocery murders, White told him that he wished to kill a local Mississippi justice of the peace known as Judge Micky because she had convicted him of driving while intoxicated the previous year. He further testified that, based upon his contact with White even before the Hill Top Grocery murders, he was of the opinion that White "is a threat and always will be." Michael LaRue, a former Waco police officer, also testified that White's reputation for being a peaceable and law-abiding citizen was bad and that he also had a reputation for violence.

Additionally, the state introduced a letter that White wrote to his wife in December 1986, which stated in part the following:

> Margaret you have told me several times that you don't want to be married anymore. For a good long while I thought you really wanted to be free from me, but now I don't think that's what you want at all. I think you still love me and want us to remain married; but you also want to be able to live with that other dude out there or write to someone else in here without me knowing it, or just don't think I'll do anything about it one. You better think again Margaret, because I'm not about to share you with anyone, and if you keep fucking around, you gonna end up getting someone hurt real bad woman. And that include here or when I get out and come to Montana. Because if you are still married to me when I get out of here, I'm coming to Montana and taking what is mine, and you are mine as long as you are married to me. And if you are fucking around with someone here behind my back, someone is just before getting hurt because no man in prison will

let another prisoner come between him and his wife and get by with it.

. . .

P.S. Margaret its very dangerous to play around with someone's wife and love life and future, and its equal as dangerous to deprive a man of what is his concerning financial help when that man is in prison depending wholy [sic] on his wife for the help he gets and needs. You might should pass that message on to the son of a bitch that split us up, because he's playing a dangerous fucking game, and it could very easy cost him dearly. More than he wants to pay too. I do know one thing he took everything away from me, even my love and joy when he came between us, and I'm not going to forget that very easy. So tell him I said walk slow and watch out for shadows in the dark, because shadows can creep up when he's least expecting them!!!!!!!! Do you catch my drift Margaret?

Your Husband
Love Excell

Dawn Apolito, one of the detention officers responsible for White's custody during his trial, also testified that White threatened Johnny White during a recess after Johnny White had testified against him. She testified that White seemed extremely tense and that he stated to her, "I guess you could see what I wanted to do back there." He then said, "That's all right, I'll get that son-of-a-bitch."

In light of the tremendous amount of evidence indicating White's propensity for violence, we are convinced that it is highly unlikely that Dr. Markman's testimony swayed the jury in its answer to the second special issue under article 37.071 of the Texas Code of Criminal Procedure. This conclusion is bolstered by the fact that Dr. Markman acknowledged during cross-

24

examination that the psychiatric profession is sharply divided by disagreement as to whether past behavior is predictive of future dangerousness. He further stated that dangerous behavior by persons with antisocial personality disorders decreases significantly with age because individuals begin to run out of energy as they reach their fifth and sixth decades. At the time of his second trial, White was forty-nine years old and thus well into his fifth decade. Based on the foregoing, we are confident that, if the trial court erred in admitting Dr. Markman's testimony, such error did not have a substantial and injurious effect upon the jury's answers to the special issues presented to it during the punishment phase.

White argues, however, that the purported Ake error in this case was not harmless because, had a psychiatrist been appointed to assist him, he may have been able to more fully develop a defense both in regard to the mens rea element of capital murder and the two special issues that the state sought to establish during sentencing. Specifically, White offers the affidavit of Dr. George Woods, which states his medical opinion that White suffered from a "toxic delirium" at the time of the offense and that it is "highly probable that [] White suffered from an organic brain disorder at the time of the offense." However, as demonstrated in Part III.A.1, supra, Dr. Woods's affidavit has no impact upon our harmless-error analysis because White did not request the appointment of a psychiatrist on any ground

25

independent of the fact that the state intended to offer psychological evidence of future dangerousness. White's trial counsel did not bring to the attention of the trial court any facts that would have evidenced the existence of a mental disorder that may have warranted the appointment of a psychiatrist to assist White. As indicated supra, if the trial court erred at all in declining to appoint White an independent psychiatrist, it erred in declining to appoint one on the basis that the state intended to offer psychiatric evidence of future dangerousness; it did not err in declining to appoint an expert on any other basis because White did not ask for the appointment of a psychiatrist on any other basis. See Williams, 989 F.2d at 844 n.10; Messer v. Kemp, 831 F.2d at 960. Because we conclude that Dr. Markman's testimony did not have a substantial and injurious effect on the jury's answers to the special issues presented to them pursuant to article 37.071 of the Texas Code of Criminal Procedure, any Ake error that occurred in this case was harmless. The district court therefore properly denied White's request for habeas relief on the basis of the alleged Ake error.

## B. Ineffective Assistance of Counsel

White also claims that the trial court's denial of his request for the appointment of an independent psychiatrist rendered his counsel's performance unconstitutionally ineffective. The Supreme Court has held that, in order to prove

26

that counsel afforded unconstitutionally ineffective assistance, a petitioner must establish that his attorney's performance was deficient and that such deficiency prejudiced his defense. See Strickland v. Washington, 466 U.S. 668, 687 (1984).

In an attempt to demonstrate deficient performance on the part of his trial counsel, White in essence simply readvances his Ake claim under the guise of an ineffective assistance claim in that he expressly states that no act or omission on the part of his trial counsel rendered counsel's assistance ineffective. In this regard, White's brief states the following:

> As far as the first prong of the Strickland analysis is concerned, the present case is not an ordinary ineffective assistance of counsel claim. The performance of Mr. White's trial counsel was not unreasonable and deficient because of what they failed to do. Trial counsel performed appropriately, recognizing the possible issues regarding Mr. White's mental capacity, recognizing the need for expert assistance in exploring these issues, and moving the court, prior to trial, for the appointment of a defense expert. Trial counsel's performance was rendered unreasonable and deficient by the combination of White's indigency, his exercise of his Fifth Amendment rights, and the trial court's refusal to simply appoint a partisan expert who would assist the defense and only the defense in the exploration of the issues regarding Mr. White's mental capacity.

White does not claim that his counsel performed ineffectively by failing to make a broader-based request for the appointment of a psychiatrist including a factual showing that might have entitled him to the appointment of a psychiatrist even absent the state's intention to present psychiatric evidence.

27

Assuming for the sake of argument that the trial court's purported <u>Ake</u> error could have rendered the performance of White's trial counsel deficient within the meaning of <u>Strickland</u>, our conclusion that the purported <u>Ake</u> error was harmless forecloses any argument that deficiency in the performance of White's trial counsel precipitated by the <u>Ake</u> error was prejudicial. In <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995), the Supreme Court observed that the precedent from which it derived the <u>Strickland</u> prejudice standard indicates that <u>Strickland</u> "would recognize reversible constitutional error only when the harm to the defendant was greater than the harm sufficient for reversal under <u>Kotteakos[ v. United States</u>, 328 U.S. 750, 776 (1946)]," which announced the harmless-error standard that the Court later held applicable to constitutional errors alleged via a habeas petition, <u>see</u> <u>Brecht</u>, 507 U.S. at 623; <u>Kyles</u>, 514 U.S. at 436; <u>cf.</u> <u>Turner v. Johnson</u>, 106 F.3d 1178, 1188 (5th Cir. 1997) (noting that a habeas petitioner could not establish <u>Strickland</u> prejudice based upon his counsel's failure to object to improper portions of the prosecution's closing argument because the argument constituted harmless error). Because the purported <u>Ake</u> error did not "ha[ve] a substantial and injurious effect or influence in determining the jury's verdict," <u>Brecht</u>, 507 U.S. at 623 (internal quotation marks omitted), assuming that it could have rendered White's counsel's performance deficient, any resulting deficiency could not have been prejudicial. The

28

district court therefore properly denied White's request for habeas relief on the basis of ineffective assistance of counsel.

## IV.   CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.