**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**August 19, 2003**

**Charles R. Fulbruge III**
**Clerk**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-41272
_____

CHARLES DEAN HOOD,

Petitioner-Appellant,

versus

JANIE COCKRELL, DIRECTOR, TEXAS
DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION,

Respondent-Appellee.

--------------------
Appeal from the United States District Court
for the Eastern District of Texas
(4:99-CV-109)
--------------------

Before SMITH, WIENER, and STEWART, Circuit Judges.

PER CURIAM:

IT IS ORDERED that Petitioner's motion to expand the district court's grant of a Certificate of Appealability ("COA") to cover a claim of constructive ineffective assistance of counsel is DENIED for the following reasons.

In his motion, Hood implicates nine issues:

1. Whether the district court misapplied the Brecht v. Abrahamson, 507 U.S. 619 (1993) harmless error standard

2. Whether the district court erroneously evaluated the Ake v. Oklahoma, 470 U.S. 68 (1985) errors under the harmless error standard

3. Whether the trial court's Ake violation in refusing to appoint Hood an independent psychiatrist prior to trial and at trial was harmless error

4. Whether trial counsel's failure to adequately preserve and pursue Hood's rights under <u>Ake</u> was harmless

5. Whether the trial court's <u>Ake</u> violation in not directing Dr. Brooks to assist the defense in preparing for trial was harmless

6. Whether the <u>Ake</u> violation by Dr. Brooks in refusing to state his opinion in his report regarding Hood's future dangerousness was harmless

7. Whether the <u>Ake</u> violation by Dr. Brooks in refusing to tell the defense his opinion on Hood's future dangerousness except from the witness stand was harmless

8. Whether the <u>Ake</u> violation by Dr. Brooks in failing to delve into mitigation issues and to provide assistance to prepare a mitigation defense was harmless

9. Whether the trial court, by forcing Hood to elect between his constitutional rights, created a constructive ineffective assistance of counsel requiring automatic reversal[1]

**I**

Texas prisoner # 000982, Hood was convicted of the 1989 capital murders of Ronald Williamson and Tracie Lynn Wallace under Texas Penal Code section 19.03(a)(2) and was sentenced to death. <u>Hood v. State</u>, No. 71, 167 (Tex. Crim. App. Nov. 24, 1993) (unpublished). His conviction and sentence were affirmed on direct appeal.

Prior to his trial, Hood moved for the appointment of an independent psychiatrist to assist him in preparing a defense at sentencing, noting that a particular need existed because, in all likelihood, his present and future mental condition would be an issue at trial and, further, that the State would have access to

---

[1] Hood does not brief issues 3-8, stating that they are premised on the contention set forth in Issue 2, that the <u>Ake</u> errors were structural, requiring automatic reversal.

2

its own expert.[2]  At the first hearing on the matter, the trial court ordered defense counsel to submit a list of psychiatrists from which the court would appoint one.  The trial court reserved decision on whether the prosecution would be able to receive a copy of the psychiatric report.

The prosecution moved for a rehearing.  At a hearing on that matter held early in June of 1990, the State requested that either a neutral psychiatrist be appointed and that the report be made available to both parties or that the prosecution's psychiatrist, if it chose to obtain one, have access to Hood.  The defense objected, arguing that if Hood's psychiatric report were required to be shared with the State, he would be forced to choose between his right to appointment of a psychiatrist and his right against self-incrimination, because sharing the report with the prosecution would be tantamount to communicating with the State.  The trial court reserved ruling on that issue.

Immediately after the hearing, however, the trial judge met with counsel for both parties in chambers.  The in-chambers conference was not recorded; however, the docket sheet indicates that the trial court granted the defense's motion as follows:  "(1) Psychiatrist appointed — information shared by both or (2) [two]

_____

[2]  At the time of Hood's offense, Texas law provided that to impose the death penalty, the jury had to make an affirmative finding that, <u>inter alia</u>, "there [was] a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."  TEX. CRIM. PROC. CODE ANN. § 37.071(b)(2) (Vernon 1981 & Supp. 2003) (Historical and Statutory Notes).  The jury was further instructed that in answering the special issues, it should consider any evidence that mitigated against imposition of the death penalty.

3

psychiatrists [appointed], one of each side's choice; interview together —— share information." The docket sheet then listed three psychiatrists, one of whom was "Dr. Brooks."

Later that month, the trial judge signed an order granting Hood's motion in part and giving him the option of choosing between two alternatives. The first alternative ordered the appointment of Dr. Sidney Brooks to conduct a psychiatric examination to determine Hood's future dangerousness and assist the jury in determining the proper sentence. Under this alternative, Dr. Brooks was ordered to prepare and file a written report of his findings with the court, which report would be made available to both parties.

The second alternative ordered that each party designate in writing one psychiatrist of its choosing before July 13, 1990, for purposes of conducting a joint interview with Hood. Each psychiatrist would report only to the party that had designated him.

This basic order specified that Hood was to file a written election of one of the two alternatives no later than July 13, 1990, and that if he failed to do so, his motion to appoint an independent psychiatrist would be denied. The order was signed for approval by counsel for Hood and for the State.

Although no written election was ever made, Dr. Brooks did conduct an examination of Hood on July 6, 1990, and submitted his report to the trial court. Dr. Brooks diagnosed Hood as having antisocial personality disorder and concluded in relevant part that Hood "ha[d] demonstrated in the past and [was] likely to

4

demonstrate in the future, particularly when subjected to provocative circumstances, a propensity to act out his aggressive instincts upon other persons and/or property." Dr. Brooks additionally diagnosed Hood with "[n]europhysiological brain dysfunction with probable left temporal cortical and deep temporal limbic brain dysfunction" and offered the opinion that "brain dysfunctional factors [were] inevitably important and contributory to Mr. Hood's personality dysfunction" and "contribute[d] to the risk of behavioral dysfunction and future dangerousness." Dr. Brooks suggested that additional testing would assist in further evaluating and confirming those clinical findings.

Dr. Brooks was not called to testify at trial, however. According to the affidavit testimony introduced at Hood's state habeas proceeding by his trial co-counsel David Haynes, the defense had access to Dr. Brooks's report, but it did not contain the doctor's opinion on Hood's future dangerousness. During the penalty phase, counsel interviewed Dr. Brooks in a courthouse witness room in an effort to obtain his position on the issue of future dangerousness, but Dr. Brooks refused to state his opinion, except from the witness stand. According to Haynes' affidavit, defense counsel elected not to call Dr. Brooks because if he had testified that Hood was a future danger, it would have been disastrous to the defense. According to the affidavit testimony of Hood's trial co-counsel George Parker, the decision not to call Dr. Brooks was made "[b]ecause of [his] refusal to provide any information not contained in his report."

5

During the penalty phase, the prosecution called two expert witnesses, both of whom testified that Hood was a sociopath who would more likely than not be a continuing threat to society. Immediately before to the close of evidence at the penalty phase, defense counsel re-urged their pre-trial motion and requested funding for an independent psychiatrist. Counsel for Hood argued that the State had the economic ability to hire two experts and that Hood had been denied such an opportunity, but the trial judge denied the motion. Based on the jury's answers to the special issues, the death penalty was assessed.

Hood filed a state application for post-conviction relief raising, inter alia,[3] the following grounds for relief: (1) The trial court's refusal to appoint an independent, confidential psychiatrist prior to and at trial violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights and Hood had never waived his right to such an expert; (2) counsel was ineffective for failing to preserve and pursue Hood's rights under Ake; and (3) counsel was ineffective for failing to investigate and present mitigation evidence. The Texas Court of Criminal Appeals ("TCCA") denied the application with written order based on the following pertinent factual findings and legal conclusions of the trial court:

1. Hood failed to choose in writing which psychiatric examination alternative he preferred.

---

[3] Only those claims that he chose to raise in his § 2254 petition are listed.

6

2. Hood agreed to cooperate with Dr. Brooks, even though counsel had advised him against it.

3. Hood impliedly elected the first option contained in the trial court's motion, both by his failure to make a written election and by cooperating with Dr. Brooks against the advice of counsel.

4. Before Hood was examined by Dr. Brooks, his legal rights were explained to him and he appeared to understand them.

5. Hood waived appellate complaint about not having his own psychiatrist by failing to exercise the option offered by the trial judge of being examined by a psychiatrist of his own choosing.

6. The options set forth in the trial court's order satisfied Ake.

7. During the course of trial counsel's representation, Hood stopped communicating with them, insisting on communicating only through counsel's legal assistant, Janet Heitmiller.

8. The unsuitability of this arrangement was made clear to Hood, but to no avail.

9. Counsel met with Hood's parents to obtain mitigating evidence; however, counsel's efforts were hampered by a lack of cooperation from Hood and members of his family.

10. Hood received effective assistance of counsel.

11. Hood failed to demonstrate a reasonable probability that his sentence would have been different but for counsel's alleged deficiencies.

Hood subsequently filed the instant § 2254 petition, raising the following issues: (1) whether his trial court's refusal to appoint an independent, confidential psychiatrist to examine Hood prior to and at trial violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights; (2) whether Hood waived his right to an independent psychiatric expert; (3) whether Hood was denied his Sixth and Fourteenth Amendment rights to effective assistance

7

of counsel at the punishment phase by counsel's failure to preserve and pursue Hood's rights under Ake, by not effectively communicating with Hood, by failing to request further medical testing so as to present a mitigation defense, and by allowing Hood to give a psychiatric interview to Dr. Brooks; (4) whether the trial court created constructive ineffective assistance of counsel by forcing Hood to abandon his rights under Ake so as to avoid self-incrimination; and (5) whether trial counsel rendered ineffective assistance during the punishment phase of trial under the Sixth and Fourteenth Amendments by failing to develop and present a mitigation defense and by delegating that responsibility to a legal assistant. The State moved for summary judgment, and the district court issued a memorandum opinion denying habeas relief for the following reasons.

Ake Claims

Future Dangerousness

The district court determined that the TCCA's finding on direct appeal that Hood had waived his Ake claims by submitting to an evaluation against the advice of counsel was untenable.[4] The district court found that both the affidavit evidence and Dr. Brooks's report supported a finding that counsel misunderstood the court's order as requiring Hood to be examined by Dr. Brooks. In support of this finding, the district court pointed to the fact

_____

[4] On direct appeal, the Texas Court of Criminal Appeals held that the fact that Hood did not exercise the option afforded him by the trial court of having a psychiatrist of his own choosing that would report solely to him meant that he had waived his appellate complaint that he was denied an independent psychiatrist.

8

that the trial court coordinator had sent a copy of the order to Hood's trial counsel and to Dr. Brooks, along with a copy of a letter to Brooks which stated, "Enclosed is a copy of the Court's Order Appointing Psychiatrist to Examine Defendant. Your contact at the sheriff's office will be Jim Hamilton, Medical Officer. . . ." Based on this letter, the district court ventured that it appeared that the court coordinator mistakenly concluded that Dr. Brooks had in fact been appointed by the trial court to examine Hood and, as a result of receiving copies of her letter with the court's order, both Hood's counsel and Dr. Brooks had the same misunderstanding. The district court found this mistake understandable, observing that the order was "somewhat ambiguous."

Based on the affidavit testimony of Janet Heitmiller[5] and information in Dr. Brooks's report, the district court found that Hood's counsel believed that he had no right to prevent Hood's interview with Dr. Brooks, and that if Hood's counsel had understood the order, Brooks would not have gone to the jail to interview Hood at all, absent an agreement in writing by Hood's counsel to the first alternative. The district court further found that neither the affidavit evidence nor Dr. Brooks's report established that Hood was ever informed of his right to refuse to be interviewed.

In sum, the district court found that Hood's counsel, the court coordinator, and Dr. Brooks all mistakenly believed that

---

[5] The district court noted Heitmiller's attestation that counsel instructed her to tell Hood not to answer any questions posed by Dr. Brooks about the crime.

9

Dr. Brooks had been appointed to examine Hood and that Hood had to submit; and, further, that this mistake was caused in part by the trial court coordinator's letter to Dr. Brooks and in part by the ambiguity of the order. The district court further found that there was no evidence to support the determination that counsel had waived the Ake claim by failing to elect in writing to pursue the order's second alternative, because the terms of the order contradicted this reasoning. Counsel never made a written election and, therefore, under the terms of the order, Dr. Brooks should not have examined Hood.[6]

Having determined that the state court's determination was unreasonable in light of the record, the district court addressed the merits of Hood's Ake claim. The court assumed arguendo that the alternatives set forth in the trial court's order violated Ake,

---

[6] Although not relevant to the resolution of the instant motion to expand the COA grant, we nevertheless note that in interviews with Hood's habeas counsel, trial counsel stated that they saw both alternatives offered in the trial court's order as constitutionally impermissible and because they did not want to waive Hood's Fifth Amendment rights, they made a purposeful decision to make no election between the options offered by the trial court. Moreover, defense co-counsel Parker's affidavit states, "The options provided by the Court, after being analyzed by Mr. Haynes and myself, were found to be options that in my opinion at the time only made Mr. Hood's situation worse if he were to exercise either option." These statements cast serious doubt on the district court's factual finding that counsel misread or misunderstood the order by reading only its first paragraph and, therefore, erroneously believed that Hood had to submit to an examination by Brooks. It is further noteworthy that habeas counsel did not argue that trial counsel (or Dr. Brooks or the court coordinator) misunderstood the order; counsel instead argued that Ms. Heitmiller erroneously informed Hood that he had to submit to the interview because the trial court had so ordered and that, for purposes of ineffective assistance, her actions were imputable to trial counsel.

10

and found that Dr. Brooks's actions violated <u>Ake</u>, insofar as he (1) disobeyed the court's order to state in his report his opinion whether there was a probability that Hood would commit future criminal acts, and (2) refused to reveal his opinion on Hood's future dangerousness except from the witness stand.[7]

The district court then assessed whether these errors were (1) structural, requiring automatic reversal, or (2) trial errors, requiring reversal only if there was a showing of harm. Citing <u>White v. Johnson</u>, 153 F.3d 197 (5th Cir. 1998), the district court held that the errors were trial errors and should therefore be analyzed under the harmless error standard. Using <u>White</u> as a guide, the district court determined that the following non-psychiatric evidence of Hood's future dangerousness was so strong that his future dangerousness would have been a foregone conclusion in the jury's mind: (1) Hood had a juvenile conviction for breaking and entering and was jailed for violating probation; (2) while in jail, Hood attempted to draw attention to himself on three occasions by deliberately injuring himself or feigning injury; (3) at age 19, Hood entered into a sexual relationship with a 15-year old girl; (4) Hood's father had grabbed him from behind while Hood was arguing with his girlfriend's mother,, and Hood struck his father and threatened to kill him; (5) Hood would force his 15-year old girlfriend to have sex with him when she would refuse; (6) Hood

---

[7] The district court additionally found that Dr. Brooks had violated <u>Ake</u> by not delving into mitigation issues and by not providing assistance to prepare a mitigation defense; however, the court noted that Hood's <u>Ake</u> claim did not encompass the mitigation issue, and therefore refused to address it.

11

took his girlfriend to Texas from Indiana and told her mother that he would kill her if she refused to allow him to see her daughter; (7) after working at Taco Bell for only three days Hood was fired for fighting; (8) shortly before the murders, Hood raped a different 15-year old girl who was visiting him and threatened to kill her if she told anyone; and (9) Hood was "written up" for fighting with another inmate while in prison awaiting trial on the murder charge. Based on the strength of this non-psychiatric evidence, the district court determined that any error in not allowing Hood to have the benefit of an independent, confidential psychiatric expert on the issue of future dangerousness, or any lack of help by Dr. Brooks in preparing a defense on this issue, was harmless.

The district court next addressed Hood's claim that trial counsel provided ineffective assistance at the punishment phase. The district court rejected Hood's constructive ineffective assistance argument, in which he contended that the trial court's order rendered counsel's representation ineffective. The district court held that its conclusion that any Ake error was harmless precluded a determination that a deficiency in counsel's performance precipitated by the court's order was prejudicial under Strickland v. Washington, 466 U.S. 668 (1984). The district court also rejected Hood's contention that counsel should have done more to preserve the right to an independent, confidential psychiatric expert. The district court found that as counsel had twice moved

12

unsuccessfully for appointment of such an expert, their performance was not deficient.

The district court nevertheless found that trial counsel's misreading of the trial court's order, and the incorrect advice given Hood based on the misreading, constituted deficient performance. The court added, however, that even if counsel had correctly read the order and advised Hood not to submit to Dr. Brooks's evaluation, the only remaining options for counsel were either to have Hood submit to a joint interview by psychiatrists for the state and defense, or to forgo any expert psychiatric assistance entirely. Thus, the district court held that because Hood failed to demonstrate that there was a probability that his sentencing would have been different but for counsel's failure to pursue the remaining alternatives, he failed to establish Strickland prejudice.

Regarding mitigation evidence, the district court rejected the contention that counsel's failure to communicate directly with Hood resulted in a failure to recognize the need to obtain additional medical testing and an additional expert and, therefore, constituted ineffective assistance. The district court found that the opinion Hood claimed might have been obtained from an additional expert — that his mental impairments contributed to his behavior — was already contained in Dr. Brooks's report. The district court identified the "real problem" as the trial court's failure to order Dr. Brooks, and Brooks's own refusal, to assist defense counsel in preparing and presenting their case in

13

mitigation.  The court reasoned that, because counsel should not have had to pursue an additional expert, the failure to do so did not constitute deficient performance.

The district court determined, however, that counsel's decision to use his legal assistant, Ms. Heitmiller, to investigate Hood's background concerning issues of mitigation was deficient performance.  This was because Ms. Heitmiller was not qualified to conduct such an investigation, and counsel had readily available the services of a trained, court-appointed investigator. The district court noted the following new mitigation evidence that was gathered post-trial:  (1) Hood's family moved often because of financial and legal trouble; his father served jail time for theft, made no financial contribution to the family, and was under investigation for incest; (2) Hood's mother was raised in an abusive home and consequently was unemotional to her children and denied or tolerated her husband's abuse of Hood and his siblings; (3) Hood's father verbally and physically abused him; (4) Hood's parents sent him conflicting signals on moral issues; (5) Hood suffered brain damage at age three after being hit by a truck, impairing his intellectual and emotional development; (6) Hood was ridiculed by classmates because of his intellectual impairment; and (7) Hood manifested emotional and behavioral problems at a young age, and they appeared to worsen over time.  Although it labeled this "a close question," the district court nevertheless determined that there was not a reasonable probability that a juror would have voted against the death penalty in Hood's case and, therefore, that

14

he had not shown <u>Strickland</u> prejudice.  The district court based this determination on a comparison of Hood's facts with those of the petitioner in <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), finding that the cases were similar but concluding that Williams's demonstration of remorse after his crimes "rendered him more worthy of mercy" than Hood.  The court thus found that there was no likelihood that Hood's jury would have been swayed by the mitigation evidence.

Hood's final ineffective assistance claim — that counsel was ineffective for not presenting the above-mentioned mitigating evidence to Dr. Brooks — was also rejected by the district court. It determined that even if counsel had performed competently by showing Dr. Brooks the mitigating evidence, there was still no reasonable probability that the result of the penalty-phase proceedings would have been different.  The court so concluded because the trial judge's order did not direct Dr. Brooks to provide such assistance, and Dr. Brooks acted in conformity with what he believed the order required, <u>i.e</u>. an impartial psychiatric evaluation.

Finally, the district court rejected Hood's contention that the cumulative effect of his trial errors rendered his trial fundamentally unfair.  The district court found that the combination of the trial court's <u>Ake</u> error in not ordering Dr. Brooks to assist the defense on the issue of Hood's future dangerousness, and of counsel's failure to present more extensive evidence in mitigation, did not have a substantial or injurious

15

effect on the jury's verdict. The district court based this determination on "the very strong non-psychiatric evidence of future dangerousness, the double-edged nature of the mitigating evidence,[8] and Hood's lack of either remorse or rehabilitation."

The district court granted the State's motion for summary judgment and denied Hood's petition for habeas relief. Hood filed a timely notice of appeal and moved to amend the judgment and, alternatively, for a new trial. He also moved for a COA.

The district court granted Hood a COA on the following issues: (1) Whether Hood's counsel's misreading of the trial court's order regarding the psychiatrist examination, and delegating to an untrained legal assistant the investigation into potential mitigating evidence, created a reasonable probability that the result of his punishment hearing would have been different had counsel's performance been adequate, and (2) whether the combination of the violations of Hood's rights under Ake and his counsel's deficient performance had a substantial and injurious effect on the jury's decision, thereby depriving him of a fair trial. COA was denied on all other claims, and the district court denied Hood's post-judgment motion.

## II

We may not grant a COA unless the applicant makes a substantial showing of the denial of a constitutional right.

---

[8] The district court recognized that the mitigating evidence of Hood's mental impairment would be a "double-edged sword," because, despite reducing his moral culpability, it also would have increased the probability of his future dangerousness.

16

See 28 U.S.C. § 2253(c)(2). "The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits." Miller-El v. Cockrell, 123 S. Ct. 1029, 1039 (2003). We look to the district court's application of the Antiterrorism and Effective Death Penalty Act (AEDPA) to the petitioner's constitutional claims and asks whether the district court's resolution of those claims was debatable among jurists of reason.

ISSUE 1:   Whether the district court misapplied the Brecht harmless
           error standard

Hood argues that in reviewing the harmlessness of the trial errors, the district court used the wrong standard when it assessed whether there was a "'reasonable probability'" that the result of the punishment phase would have been different but for the errors. Relying on Brecht and Woods v. Johnson, 75 F.3d 1017, 1027 (5th Cir. 1996), Hood contends that the district court was required to ask instead whether there was "'more than a mere possibility'" that the error contributed to the verdict. Noting that the district court found the issue whether the penalty proceedings would have been different a "'close question,'" Hood argues that he is entitled to relief under the "more than a mere possibility" standard. He further contends that under the "more than a mere possibility" standard, the cumulative impact of the trial errors requires a finding of harm.

17

Brecht held that constitutional errors that do not require automatic reversal would be assessed on collateral review under the harmless error standard set forth in Kotteakos v. United States, 328 U.S. 750 (1946). 507 U.S. at 623. Under that standard, the error must have "had substantial and injurious effect or influence in determining the jury's verdict" for the petitioner to obtain habeas relief. Id. In Woods, we reasoned that, under Brecht, a defendant is not entitled to relief "unless there is more than a mere reasonable possibility that [the constitutional trial error] contributed to the verdict." 75 F.3d at 1026. We noted further that the Brecht standard does not require the petitioner to prove by the more demanding "reasonable probability" standard that, absent the error, the result of the proceeding would have been different. Id. at 1027 (citing Kyles v. Whitley, 514 U.S. 419, 436 (1995); see also Barrientes v. Johnson, 221 F.3d 741, 756 (5th Cir. 2000) (noting that the "reasonable probability" standard is more demanding than the Brecht harmless error standard).

Hood asserts that the district court erroneously held him to the more demanding "reasonable probability" standard when it (1) evaluated the harmlessness of the Ake errors, (2) evaluated the prejudice prong of his ineffective assistance of counsel claims, and (3) evaluated the effect of the cumulative error. The record, however, does not support Hood's assertion that the district court applied the "reasonable probability" standard when evaluating the Ake claims. Based on its summary of the non-psychiatric evidence of Hood's future dangerousness, the district court held that Hood's

18

future dangerousness would have been a foregone conclusion in the mind of the jury, so that any Ake error was harmless. Further, the district court correctly identified the Brecht standard, and no where in this portion of its opinion does the court use the words "reasonable probability."

Additionally, the Brecht standard was inapplicable to Hood's ineffective assistance claims. Instead, the district court was required to evaluate whether "there [was] a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694 (emphasis added). The court thus applied the appropriate standard when determining whether counsel's errors were prejudicial. The district court concluded that there was not a "reasonable probability" that the result of Hood's penalty proceeding would have been different. See also Barrientes, 221 F.3d at 756 (noting that "Strickland claims utilize the more demanding 'reasonable probability' standard").

Finally, the district court reviewed Hood's claim of cumulative error under the Brecht standard and determined that counsel's failure to introduce the psychiatric and the mitigating evidence would not have substantially or injuriously influenced the verdict. There is no support in the record for Hood's contention that the district court applied the "reasonable probability" standard to this claim.

19

Based on the foregoing arguments, Hood has not demonstrated that the district court's resolution of these constitutional claims was debatable.

ISSUE 2:   Whether the district court erroneously evaluated the Ake errors under the harmless error standard

Hood insists that the district court erroneously classified the Ake errors as "trial" errors (which are properly evaluated under the harmless error standard), when the errors were in fact "structural" and, therefore, required automatic reversal.  Relying on our decision in White, Hood contends that a defendant who makes a showing that his mental condition could have been a significant mitigating factor and then suffers an Ake error has suffered a structural error.  He further notes that the TCCA has held that Ake error is not subject to a harmless error analysis and, further, that in Ake, the Supreme Court reversed and remanded without conducting a harmless error analysis.

Whether a constitutional error is reviewed for harmless error depends on whether the error is characterized as "trial error" or "structural error."  White, 153 F.3d at 201.  "Trial error" occurs during the presentation of the case and is subject to a harmless error analysis because "it 'may . . . be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial].'"  Id. (quoting Brecht, 507 U.S. at 629).  "Structural error," however, "'affect[s] the framework within which the trial proceeds, rather than simply

20

an error in the trial process itself'" and is therefore not subject to the harmless error analysis.  Id. at 201-02 (quoting Arizona v. Fulminante, 499 U.S. 279, 310 (1991)).

In Ake, the Supreme Court held in relevant part that when the state presents psychiatric evidence on the issue of a capital defendant's future dangerousness for purposes of establishing an aggravating factor to be considered at sentencing, due process requires that the defendant be afforded access to a psychiatric examination on relevant issues, to psychiatric testimony, and to assistance in preparation at the penalty phase.  470 U.S. at 83-84.  After determining that Ake suffered due process violations when he was denied the assistance of a psychiatrist, the Court reversed and remanded for a new trial.  Id. at 86-87.

The Court has never held definitively, however, that Ake error is structural.  See Briseno v. Cockrell, 274 F.3d 204, 210-11 (5th Cir. 2001) (recognizing same).  Indeed, in Tuggle v. Netherland, 516 U.S. 10, 14 (1995), the Court remanded for a determination "whether, or by what procedures, the sentence might be sustained or reimposed" in light of an Ake error, specifically noting that neither the state court nor the Court of Appeals had addressed the applicability of the harmless error analysis.

A federal habeas petitioner must establish that he is entitled to relief under "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); see Williams, 529 U.S. at 381. Consequently, the absence of Supreme Court authority on this issue,

in addition to the fact that the district court's use of the harmless error analysis was not inconsistent with other Supreme Court precedent, precludes a finding that the district court's resolution of the constitutional claim was debatable. Cf. Ledford v. Thomas, 275 F.3d 471, 474 (5th Cir. 2001) (absence of Supreme Court precedent on point precluded finding that state court's adjudication involved an unreasonable application of federal law), cert. denied, 536 U.S. 927 (2002).

Furthermore, because relief must be established under federal law, Hood's contention based on Rey v. State, 897 S.W.2d 333, 346 (Tex. Crim. App. 1995) (holding that Ake error cannot be evaluated for harm), that the TCCA has held Ake error to be structural, is irrelevant. Citing the absence of an explicit statement from the Supreme Court on this issue, we have concluded that Rey's holding has been overruled by Cain v. State, 947 S.W.2d 262, 264 (Tex. Crim. App. 1997),[9] which held that "[e]xcept for certain federal constitutional errors labeled by the United States Supreme Court as 'structural,' no error . . . is categorically immune to a harmless error analysis." Briseno, 274 F.3d at 210-11 (internal quotations omitted) (quoting Cain, 947 S.W.2d at 264) (emphasis added).

Finally, we have squarely addressed this issue and have held that Ake errors are subject to harmless error review. White, 153 F.3d at 201 ("Three other circuits have expressly concluded that Ake error is subject to harmless-error analysis, and we now join

_____

[9] Cain was superseded by statute on other grounds by Aquirre-Mata v. State, 992 S.W.2d 495, 497-98 (Tex. Crim. App. 1999).

them."). Hood urges that <u>White</u> limited the application of harmless error review to cases in which a defendant failed to make a showing that his mental condition could have been a significant mitigating factor, leaving unanswered the question whether a defendant who makes a proper showing and then suffers an <u>Ake</u> violation has suffered a "trial" or "structural" error. Hood reads <u>White</u> too narrowly; but even assuming <u>arguendo</u> that <u>White</u> did not foreclose a determination that <u>Ake</u> error is structural when a defendant has established to the state trial court that his mental condition could have been a significant mitigating factor, Hood failed to make such a showing. Like White, Hood argued that he was entitled to the appointment of a psychiatrist only because the State intended to present its own psychiatric testimony; he made no showing that he was entitled to a psychiatrist on any other basis. <u>White</u>, 153 F.3d at 204. <u>White</u> held such a showing insufficient to establish that any purported <u>Ake</u> error was structural. See <u>White</u>, 153 F.3d at 203-04 (holding that showing of an entitlement to psychiatric assistance on the sole basis that the State intended to present expert testimony was subject only to harmless error review.).

In light of the foregoing, Hood has not demonstrated an entitlement to a COA on this issue.

ISSUES 3-8:      <u>Whether    the    specified    Ake    errors require automatic reversal</u>

Hood does not brief issues three through eight; he instead states that each is premised on his contention that the district court erroneously evaluated the <u>Ake</u> error under the harmless error standard.  As just noted, however, Hood has not demonstrated that the propriety of the district court's application of the harmless error standard is debatable.  Therefore, he has also failed to demonstrate entitlement to a COA on issues three through eight.

ISSUE 9:      <u>Whether the trial court, by forcing Hood to elect between his constitutional rights, created a constructive ineffective assistance of counsel requiring automatic reversal</u>

Hood contends that the state trial court's order appointing a psychiatrist assured that defense counsel's assistance would be ineffective.  He argues that the alternatives provided defeated the adversarial nature of the proceedings, inasmuch as the common thread to each alternative was that the State would receive full disclosure.  Hood asserts that the district court's determination that he established no <u>Strickland</u> prejudice as a result of this error was based on the court's erroneous determination that the <u>Ake</u> errors were harmless trial errors rather than structural errors and, therefore, that he is necessarily entitled to a COA on this issue as well.

As a prefatory matter, we note that the issue whether Hood exhausted his "constructive" ineffective assistance claim was

24

raised in the district court. In his § 2254 petition, Hood contended that "the facts and argument set forth in this Claim were presented to the State habeas court as part of Claims 1 and 2." The State argues, however, that Hood presented this claim for the first time in his federal habeas proceedings and that it was therefore procedurally barred. The district court did not address the State's procedural bar contention, instead disposing of the claim on its merits.

A review of the state habeas application reveals that this "constructive" ineffective assistance claim was not raised and therefore was not exhausted. See Nobles v. Johnson, 127 F.3d 409, 420 (5th Cir. 1997) (exhaustion requirement is not met merely because the facts necessary to support the federal claim were before the state court). When a claim is unexhausted and therefore procedurally barred, however, it may nevertheless be denied on the merits. Smith v. Cockrell, 311 F.3d 661, 684 (5th Cir. 2002). Hood would be precluded from raising his "constructive" ineffective assistance claim in the state courts under Texas's abuse of the writ doctrine, because he has cited no cause for his failure to raise this claim in his state habeas application. It is therefore procedurally barred. See Nobles, 127 F.3d at 423.

Notwithstanding the applicability of procedural bar, however, we find that this claim fails on its merits, because it hinges on Hood's contention that he is entitled to a COA on the issue whether Ake errors are structural. As previously discussed, in the absence of clearly established Supreme Court law holding that Ake errors

25

are structural, Hood cannot demonstrate an entitlement to a COA on that issue. Therefore, he is not entitled to a COA on his constructive ineffective assistance claim. In addition, <u>White</u> supports the district court's determination that, because the <u>Ake</u> error was harmless, Hood was precluded from establishing <u>Strickland</u> prejudice. <u>See</u> 153 F.3d at 208; R. 2, 499.

## III

Hood has not established an entitlement to a COA on any of the issues raised herein, and, therefore, his motion to expand the COA grant is

DENIED.

S:\OPINIONS\UNPUB\00\00-41272.0.wpd
6/20/01  4:39 PM

26